**John A. HINCHEY, Plaintiff, Appellant,**

v.

**NYNEX CORPORATION, and Telesector Resources Group, Inc., Defendants, Appellees.**

No. 97–2253.

United States Court of Appeals, First Circuit.

Heard March 6, 1998.

Decided May 20, 1998.

Kevin M. Akre, for appellant.

Barry A. Guryan, with whom, Michael J. Tuteur, Karen K. Burns and Epstein, Becker & Green, P.C.; and Amy B. Seifer, Counsel, Bell Atlantic Corporation, were on brief, for appellees.

Before BOWNES and CYR, Senior Circuit Judges, and STEARNS*, District Judge.

BOWNES, Senior Circuit Judge.

Plaintiff John A. Hinchey brought this diversity action against his former employer, NYNEX Corporation ("NYNEX") and Telesector Resources Group, Inc. ("TRG")[1] ,for damages arising from his alleged wrongful termination. Specifically, plaintiff's claims include breach of contract, promissory estoppel, intentional misrepresentation, fraud and deceit, negligent misrepresentation, intentional and negligent infliction of emotional distress, and wrongful discharge in violation of public policy. It is Massachusetts substantive law that controls. The district court judge granted defendants' motion for sum-

---

\* Of the District of Massachusetts, sitting by designation.

1. At the time of plaintiff's termination, New England Telephone ("NET") and New York Telephone ("NYT") were wholly-owned subsidiaries of NYNEX Corporation. Telesector Resources Group, Inc. is a subsidiary of both NET and NYT. The defendants will be referred to collectively as "NYNEX" or "the Company."

mary judgment, based primarily on his determination that plaintiff had not provided sufficient evidence on any of his seventeen claims to warrant a jury trial. We affirm.

# I.

## *Facts*

Viewed in the light most favorable to the nonmoving party (Hinchey), the following facts are treated as undisputed for purposes of summary judgment. *See Dubois v. United States Dep't of Agric.,* 102 F.3d 1273, 1284 (1st Cir.1996), *cert. denied,* ⸺ U.S. ⸺, 117 S.Ct. 2510, 138 L.Ed.2d 1013 (1997).

In October 1965, plaintiff Hinchey began working for New England Telephone as a candidate for the Initial Management Development Program ("IMDP").[2] After working in various technical management positions and receiving positive evaluations, Hinchey was promoted in 1982 and became responsible for Corporate Communications. From August 1991 until April 1993, he was an acting Assistant Vice President. At the time of his termination, Hinchey held the position of Director of Technical Support in the Information Services Organization within TRG.

On April 15, 1983, the Company distributed its Code of Business Conduct ("1983 Code" or "the Code") to all employees. The purpose of the Code was to acquaint employees with the Company's "core values" and ethical standards. In essence, these values and standards amounted to an espousal of responsible and legal behavior on the part of employees and the Company. The 1983 Code also included a non-retaliation provision which assured an employee protection against reprisal for reporting violations of the Code. All employees were required to acknowledge their assent to the provisions of the Code with a signature. Because Hinchey believed that the Code, once signed, would be a binding document, he added the following statement before signing it:

> I love the Bell System and New England Tel[ ] Co[ ], but I am not "satisfied" with my progress to date and cannot, in con-

science[,] fully support all existing interpretations of corporate policy. Therefore I cannot exclude the possibility of initiating external review of these concerns and situations. However, my objective continues to be to work toward the betterment of the Company as well as myself.

Ed McCauley, Hinchey's supervisor at the time, was aware of Hinchey's intention to add the statement. He was uncertain, however, how it would be interpreted by upper-level management and cautioned Hinchey to carefully consider his decision to add it. In the end, Hinchey added the statement and considered it to be a negotiated-for exception to portions of the Code which prohibit public disclosure of company policies or practices. Despite the added statement, Hinchey thought the non-retaliation provision still applied to him. In fact, he believed that the added statement solidified his perception that the Code was a binding contract between the Company and himself.

NYNEX revised its Code of Business Conduct in 1992 and 1993, adding, inter alia, a statement expressly disclaiming any contractual obligations. Although Hinchey received copies of the 1992 and 1993 codes, he did not question the Company's right to alter the substance of the 1983 Code. Rather, Hinchey continued to assume that his added statement to the 1983 Code was in effect and provided him a contractual exception to the corporate policy of confining complaints within the Company's framework.

In January 1992, NYNEX implemented a Force Management Plan ("FMP") to regulate force reduction procedures for management personnel. Once a force surplus is perceived, the FMP outlines a detailed procedure by which to identify employees in the surplus job categories and assess them against defined criteria. A Supervisor's Guide was issued to all management to assist in the downsizing process. The FMP contained an explicit disclaimer:

> The FMP Guidelines are not inflexible, do not constitute a contract of employment, and should not be interpreted as creating a

---

2. The IMDP is a training regimen for employees who have been identified as being potentially

qualified for management positions.

contract of employment, either expressed or implied. The employment relationship between the Corporation and its management employees is by mutual consent (employment-at-will), and may be terminated by either the Corporation or the employee at any time for any reason.... These guidelines may be changed unilaterally by the Corporation at any time and for any reason.... Nothing in these guidelines should be interpreted as a limitation, either expressed or implied, on the Corporation's right to discharge or otherwise discipline its employees.

NYNEX Force Management Plan Resource Guide [3]. Despite the disclaimer, Hinchey believed that the FMP had been followed in all force reductions that he knew of and that it therefore was a "mandatory and binding procedure" which would be followed in the future.

On May 5, 1992, Hinchey began discussions with his direct supervisor, Vice President Joseph Castellano, regarding "business and procurement irregularities" allegedly perpetrated by NYNEX. Hinchey complained that he had observed a "pattern of negligence and closed-mindedness" within NYNEX for twenty-five years that he thought clearly violated the Code of Business Conduct. Hinchey asserts that Castellano made no attempt to address his concerns or end the irregularities.

In early 1993, Hinchey received his performance appraisal for 1992. Despite mostly positive feedback, he received what he considered to be a negative evaluation in the "Communication" category. Hinchey knew that such an evaluation might lead to termination under the FMP, so he approached Castellano on February 24, 1993, to talk about a voluntary separation plan for himself. Hinchey's proposed plan included, inter alia, a stipulation that he would receive two years "net credited service" in return for his voluntary separation. "Net credited service" refers to the number of years an employee has worked at NYNEX. The Company's retirement plan specified that an employee with

less than thirty years of service to the Company (i.e., thirty years of net credited service) at the time of retirement would be subjected to a pension reduction. Because he had been employed at NYNEX for only twenty-eight years, his separation proposal included a stipulation that he would be given two extra years of net credited service in order to ensure a full pension. Castellano told Hinchey that he would consider his proposal. Hinchey heard nothing further about his plan for several months.

On July 19, 1993, Hinchey called Ivan Seidenberg, Vice–Chairman of NYNEX, to schedule an appointment during which Hinchey could discuss his allegations of irregularities. One hour later, Hinchey received a phone call from Castellano, during which Castellano stated, "Of course you can talk with Ivan [Seidenberg] if you wish but I have worked out just what you want." Hinchey responded, "Joe [Castellano], that's not what I want, that's what I said I would accept back in February." He also said, "Now you have demoted me and have ruined my career and now you've ruined my reputation and unless I get a permanent promotion I am going to talk it over with Ivan. I don't understand why you couldn't have just talked with me and have been straight with me." Pl.'s Aff. dated July 10, 1997, at 10.

On August 5, 1993, Hinchey met with Castellano and was terminated. Hinchey's termination papers indicated that he was discharged under the FMP. At that meeting, Hinchey was told by Castellano that he would receive the net credited service he had requested, even if it had to be paid out of departmental funds. Castellano instructed Hinchey to see William Coffey, Director of NYNEX's Human Resources Department, to "work it out." When Hinchey spoke to Coffey, however, Coffey stated that a grant of net credited service could not be provided within the framework of an FMP termination, but that he would work on it with Castellano. On one or two other occasions, Castellano reasserted his promise to Hinchey, telling him to submit a voucher for the

**3.** Because the Appendix does not contain consecutive page numbers, we are unable to cite to specific pages in the Appendix.

net credited service. When Hinchey submitted a voucher to Castellano, however, Castellano sent it back to him with a note explaining that he needed to see Coffey regarding this issue. Hinchey never received the two years net credited service that Castellano promised he would receive.

Subsequent to his termination, Hinchey canceled his scheduled meeting with Seidenberg. He persisted, however, in trying to set up a conference with Seidenberg. In December, Seidenberg finally met with Hinchey, but Hinchey asserts that the one and a half hour meeting did not provide sufficient time to cover all of his concerns. As a result, Hinchey sent Seidenberg a series of letters with attachments detailing the company policies and practices with which he was concerned. During this time, Hinchey was also in contact with Bill Pucci, NYNEX's Managing Director—Office of Business Conduct. Pucci informed Hinchey that, in an effort to settle the matter, Seidenberg would be willing to offer him a short-term position as a consultant, two years of net credited service equivalent in an annuity, and access to an executive placement service. Hinchey responded that the proposal did not offer what he considered to be appropriate compensation considering the damage his reputation had suffered. Hinchey later stated to Pucci, "I would consider a million dollars appropriate if they hired me back, and ... if I'm left with nothing, no reputation, 10 million dollars wouldn't be enough." Hinchey Dep. dated February 13, 1997, at 97. Although Hinchey indicated that these dollar amounts were not "hard numbers," no final agreement between Hinchey and Seidenberg was reached, and Hinchey consequently brought this lawsuit.

## II.

### Standard of Review

■ We review the district court's grant of summary judgment de novo. *See Dubois,* 102 F.3d at 1283. Summary judgment may be granted only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

Fed.R.Civ.P. 56(c). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment...." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986). Rather, to be considered material, a disputed fact must have the potential to "affect the outcome of the suit under the governing law." *Id.* at 248, 106 S.Ct. at 2510.

■ The party moving for summary judgment, here the Company, bears the initial burden of demonstrating that there are no genuine issues of material fact for trial. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). This burden "may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325, 106 S.Ct. at 2554. After such a showing, the "burden shifts to the nonmoving party, with respect to each issue on which he has the burden of proof, to demonstrate that a trier of fact reasonably could find in his favor." *DeNovellis v. Shalala,* 124 F.3d 298, 306 (1st Cir.1997) (citing *Celotex,* 477 U.S. at 322–25, 106 S.Ct. at 2552–54).

■ In the end, upon examining the facts in the light most favorable to the nonmoving party and drawing all reasonable inferences in his favor, *see Dubois,* 102 F.3d at 1284, we are required to determine if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson,* 477 U.S. at 249, 106 S.Ct. at 2511.

## III.

### Breach of Contract Claims

Hinchey's brief is somewhat unclear as to what alleged agreements he is referring to in asserting his breach of contract claims. As we understand it, he has asserted that three binding contracts between him and NYNEX were in existence: the 1983 Code, the FMP, and the oral promise of net credited service.

## A. *Code of Business Conduct and Force Management Plan*

■ It is well settled in Massachusetts that employment is presumed to be at-will unless there exists an express or implied contract governing its terms and conditions. *See Jackson v. Action for Boston Community Dev., Inc.*, 403 Mass. 8, 525 N.E.2d 411, 412 (1988).[4] The Massachusetts Supreme Judicial Court ("SJC") has determined that a personnel manual may, in some cases, form the basis of such a contract. *See O'Brien v. New England Tel. & Tel. Co.*, 422 Mass. 686, 664 N.E.2d 843, 847 (1996) (citing *Jackson*, 525 N.E.2d at 415); *see also Hobson v. McLean Hosp. Corp.*, 402 Mass. 413, 522 N.E.2d 975, 977 (1988).

■ There is no explicit test or "rigid list of prerequisites" to aid in ascertaining if a personnel manual comprises a binding contract under Massachusetts law. *O'Brien*, 664 N.E.2d at 847. Rather, factfinders must consider several factors recently articulated by the SJC in *Jackson*, 403 Mass. 8, 525 N.E.2d 411, which held that no implied contract based on the terms of the personnel manual existed where: 1) the employer retained the right to unilaterally modify terms; 2) the terms of the manual were not negotiated; 3) the manual stated that it provided only guidance regarding the employer's policies; 4) no term of employment was specified in the manual; 5) the employee did not sign the manual to manifest assent. *Id.* at 415–16. The SJC has clarified that these factors are not an inflexible list, but rather a set of circumstances which would "make a difference or might make a difference in deciding whether the terms of a personnel manual were at least impliedly part of an employment contract." *O'Brien*, 664 N.E.2d at 847. Stated another way, these factors help determine if an employee could reasonably have believed that the "employment manuals he or she was given constituted the terms or conditions of employment, equally binding on employee and employer." *Derrig v. Wal–Mart Stores, Inc.*, 942 F.Supp. 49, 55 (D.Mass. 1996) (citing *O'Brien*, 664 N.E.2d at 848–49).

■ The first issue is whether it was objectively reasonable for Hinchey to believe that the terms of the 1983 Code comprised mutually binding contractual obligations. The added statement, essentially declaring that Hinchey did not assent to the full terms of the Code, did not make the Code mutually binding. His assertion that the added statement constituted a negotiated-for exception to the Code is based on an assumption that has no legal or factual foundation. Hinchey has produced no evidence showing or tending to show that McCauley (the supervisor present when the statement was added) had actual authority to negotiate exceptions to the 1983 Code. Nor was there any evidence of apparent authority, which " 'results from conduct by the principal which causes a third person reasonably to believe that a particular person . . . has authority to enter into negotiations or to make representations as his agent.' " *Linkage Corp. v. Trustees of Boston Univ.*, 425 Mass. 1, 679 N.E.2d 191, 203, *cert. denied*, —— U.S. ——, 118 S.Ct. 599, 139 L.Ed.2d 488 (1997) (alteration in original) (quoting *Hudson v. Massachusetts Property Ins. Underwriting Ass'n*, 386 Mass. 450, 436 N.E.2d 155, 159 (1982)).

Furthermore, even if McCauley had possessed authority to negotiate a contractual exception to the Code, there is no evidence that any real negotiations occurred. Hinchey himself testified in a deposition that his supervisor counseled against adding the statement. That Hinchey added it anyway does not demonstrate that a negotiation about the terms of the Code took place. In addition, the ambiguous language of the

---

**4.** Hinchey argues on appeal that the district judge incorrectly classified his employment at NYNEX as being at-will, even after the judge determined that neither the Code nor the FMP functioned as contracts. He asserts that his participation in the IMDP (Initial Management Development Program) secured him "guaranteed employment except under very limited circumstances." Although it is clear that Hinchey has not provided sufficient evidence of such guaranteed employment, *see Boothby v. Texon, Inc.*, 414 Mass. 468, 608 N.E.2d 1028, 1034 (1993); *Rydman v. Dennison Mfg. Co.*, 373 Mass. 855, 366 N.E.2d 763, 763 (1977), such evidence would be irrelevant. If Hinchey believed that NYNEX violated his IMDP contract, then he should have alleged that breach as a cause of action. Because he merely mentions it in passing, the IMDP contract is not properly before us.

statement cannot be read as an exemption to a specific provision. Rather, the statement appears to be a general exception allowing Hinchey the opportunity to decide in the future whether or not he will abide by the Code. Accordingly, we find that no rational juror could conclude that it was objectively reasonable for Hinchey to believe that the 1983 Code was mutually binding on him and the Company.[5]

■ Hinchey's claim regarding the breach of the FMP also fails as a matter of law. Hinchey asserts that there is a disputed issue of material fact regarding whether proper FMP procedures were followed prior to his termination. We need not reach that issue, however, because we find that the FMP contained no binding contractual obligations. There is simply a dearth of evidence in the record supporting Hinchey's contention that he reasonably believed the FMP was a "mandatory and binding procedure." Clearly, there was no negotiation regarding the terms of the manual, nor was there a term of employment specified within it. Further, there was an explicit disclaimer, in which NYNEX retained the right to unilaterally modify the FMP. Hinchey, by his own assertion, was extremely knowledgeable of the FMP and proficient in its implementation. Accordingly, a rational juror could only conclude that Hinchey's awareness of the disclaimer, in addition to the absence of any negotiation or specified term of employment, made it unreasonable for him to claim the FMP as a source of contractual rights.

### B. Net Credited Service

■ Hinchey asserts that the Company's oral promise (made by Castellano) to give him two years of net credited service was a contractually binding agreement. To survive summary judgment on this claim, Hinchey must provide evidence sufficient for a reasonable juror to find that he proved each element of the contract. See Celotex, 477 U.S. at 322, 106 S.Ct. at 2552. We

examine first the factual foundation for Hinchey's oral contract claim.

Stripped to their essentials, the facts are as follows. Hinchey proposed to Castellano that he would retire voluntarily if he were given two years net credited service so as to bring his twenty-eight years of service up to thirty years, thus giving him a full pension. Six months later, Castellano told Hinchey that he had "worked out just what you want." Hinchey rejected this offer and told Castellano that he wanted a permanent promotion. Hinchey met with Castellano a month later and was terminated under the FMP. He was told by Castellano that he would receive the two years net credited service. There is no doubt that Hinchey was given the run-around by Castellano and Coffey when he attempted to obtain the net credited service. This, however, did not deter him from pursuing Seidenberg, Vice–Chairman of NYNEX. He was also in contact with Pucci, Director of NYNEX's Office of Business Conduct. Pucci told him that Seidenberg was willing to offer him a short-term position as a consultant, two years of net credited service equivalent in an annuity and access to an executive placement service. Hinchey rejected this offer and later told Pucci that he "would consider a million dollars appropriate, if they hire me back."

Hinchey rejected the two oral offers made by the Company, upping the ante each time. Clearly, there was no meeting of the minds and hence no contract. See Jamestown Portland Cement Corp. v. Bowles, 228 Mass. 176, 117 N.E. 41, 43 (1917).

■ Moreover, there could be no oral contract because of the failure of consideration by Hinchey. The promises relied upon by Hinchey were made after his termination. "[I]n order for a contract to have valid consideration, the contract must be a bargained-for exchange in which there is a legal detriment of the promisee or a corresponding benefit to the promisor." Frankina v. First Nat'l Bank of Boston, 801 F.Supp. 875, 886 (D.Mass.1992), aff'd, 991 F.2d 786 (1st Cir.

---

5. On appeal, Hinchey asserts that he is relying solely upon the 1983 version of the Code in this count. His complaint and deposition testimony, however, state differently. Despite this confu-

sion, our result would be the same for the 1992 and 1993 revisions, both of which expressly disclaimed any contractual obligations.

1993) (citing *Graphic Arts Finishers, Inc. v. Boston Redevelopment Auth.*, 357 Mass. 40, 255 N.E.2d 793, 795 (1970)). Legal detriment means " 'giving up something which immediately prior thereto the promisee was privileged to retain, or doing or refraining from doing something which he was then privileged not to do, or not to refrain from doing.' " *Graphic Arts Finishers, Inc.*, 255 N.E.2d at 795 (quoting Williston, *Williston on Contracts* § 102A (3d ed.1957)).

Castellano reiterated the offer of net credited service to Hinchey after Hinchey was terminated. At that point, however, there could be no consideration. Hinchey was no longer working for NYNEX and could not give anything of value in exchange for the promise. The same is true for Seidenberg's offer. The plaintiff's characterization of the promise as a contract fails as a matter of law because of lack of consideration. For the reasons stated, we affirm summary judgment on this count.

## IV.

### *Promissory Estoppel*

As an alternative to his contract claim, Hinchey argues that he is entitled to damages on the basis of promissory estoppel. Specifically, he alleges that the promises NYNEX made regarding the 1983 Code, FMP, and net credited service should be enforceable.

Under the doctrine of promissory estoppel in Massachusetts, " ' "[a] promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise." ' " *Veranda Beach Club Ltd. Partnership v. Western Sur. Co.*, 936 F.2d 1364, 1380 (1st Cir.1991) (quoting *McAndrew v. School Comm. of Cambridge*, 20 Mass.App.Ct. 356, 480 N.E.2d 327, 332 (1985) (quoting Restatement (Second) of Contracts § 90(1) (1981))). To prove his promissory estoppel claims, Hinchey must adduce evidence of, inter alia, reliance—that is, he must demonstrate that he undertook an " 'act or omission resulting from' "

NYNEX's representations. *Presto v. Sequoia Sys., Inc.*, 633 F.Supp. 1117, 1120 (D.Mass.1986) (quoting *Cellucci v. Sun Oil Co.*, 2 Mass.App.Ct. 722, 320 N.E.2d 919, 923 (1974), *aff'd*, 368 Mass. 811, 331 N.E.2d 813 (1975)). Because Hinchey has failed to produce sufficient evidence of reasonable reliance as to any of his three claims, we find that they fail as a matter of law.

In regard to the oral promises of net credited service, Hinchey has not adduced adequate evidence of reliance. Hinchey asserts that he ceased his pursuit of higher-level review of his 1992 appraisal and terminated his employment search in reliance on the Company's promises. It is irrelevant that, prior to termination, Hinchey abandoned his efforts to get higher-level review of the appraisal. As discussed *supra*, he had rejected a promise of two years net credited service prior to termination. Therefore, the only claims which could be viable are the promises of net credited service made subsequent to termination. To survive summary judgment on this claim, Hinchey would have had to produce evidence demonstrating that, after being terminated, he decided not to reinitiate review because of the Company's promises of net credited service. No such evidence exists. On the contrary, Hinchey vigorously pursued Seidenberg (Vice–Chairman of NYNEX). Among other things, Hinchey met with him for one and a half hours. He took the opportunity to complain about a variety of things and provided Seidenberg with information regarding his 1992 appraisal, calling it "[a] gross instance of discrimination and prejudice," in the hopes that Seidenberg would rehire him. There is no evidence that the Company's promises in any way induced Hinchey to avoid or forego an effort to reverse any employment decision.

Hinchey's second assertion—that he terminated his employment search—also fails. Hinchey has not offered evidence demonstrating that, subsequent to termination, he chose not to seek outside employment in reliance on the Company's promises. The record indicates that Hinchey's reason for not pursuing employment was that he thought that his termination ruined his reputation and chances of getting hired. There is

no evidence that the Company's promises of net credited service induced Hinchey to cease his pursuit of employment. In fact, Hinchey did not sit idly by, satisfied with the prospect of net credited service; rather, he pursued Seidenberg with hopes that Seidenberg would rehire him. As a matter of law, the Company's post-termination promises did not cause Hinchey to change his position in any legal sense. *See Cellucci*, 320 N.E.2d at 923.

Hinchey has also failed to provide sufficient evidence of reliance on the promises NYNEX made to him in the FMP. There is nothing on the record which would support a reasonable juror's finding for Hinchey on this claim. Again, Hinchey's bald assertions of reliance—that he ceased his pursuit of higher-level review and terminated his employment search—are completely unsupported by evidence.

Finally, the promissory estoppel claim based on the 1983 Code also fails. In order to survive summary judgment, Hinchey must provide evidence demonstrating that, in reliance on the non-retaliation provision, he made complaints regarding violations of the Code. Hinchey has failed to provide such evidence.

There is no evidentiary support for Hinchey's contention that he relied on the Code's protection. The record indicates that Hinchey's actions were not within the scope of the Code's protection. Rather, his complaints, as memorialized in the letters sent to Seidenberg subsequent to termination, dealt with discretionary, internal policies of the Company. Although he characterizes these policies as being "unbelievable" and "gross[ly] negligen[t]," Hinchey does not adduce evidence demonstrating that these policies were in fact violations of the Code. His complaints tended to deal with technology decisions which Hinchey believed to be inefficient or wasteful. For example, critical of NYNEX's decision to invest in certain software development products, Hinchey wrote to Seidenberg, "Managers and non[-]technical charlatans who had never deployed a major commercial application, were making reckless and irresponsible acquisitions based purely on pretty pictures and salesmen's hype." Compl., Ex. 13 at 4. Other examples of Hinchey's dissatisfaction with policies and decisions made by NYNEX abound. But without specific evidence demonstrating that such internal matters were illegal or otherwise violated the Code, Hinchey cannot claim that he made these complaints in reliance on the Code.

We note, however, that Hinchey has made some allegations of "anti-trust and procurement irregularities." Such allegations address behavior which is specifically covered in the Code and, if supported by the record, might therefore constitute evidence of Hinchey's reliance on the Code. Specifically, Hinchey stated that the Company "purchase[d] supplies and materials from unqualified [ ] over[-]priced and/or extraneous vendors in violation of applicable regulations and law even though significantly superior life cycle price/performance alternatives were readily available." Compl. ¶ 116–17. As a result of "engaging superfluous/less qualified vendors," NYNEX caused "economic detriment to ratepayers and stockholders." *Id.* The first time Hinchey elaborated on these allegations of antitrust and procurement abuse was in a deposition, where he mentioned one possible situation. Although such behavior would be covered by the Code, we find this single shred of evidence insufficient to warrant trial. After all, "[T]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252, 106 S.Ct. at 2512.

The record is quite clear on the fact that Hinchey spoke his mind on a variety of issues, without regard for the animosity or tension he created in so doing. His inclination toward complaining is evident. The fact that, on one single occasion, he complained to Castellano about behavior covered by the Code is not sufficient to support a plausible assertion of reliance in the face of a plethora of complaints concerning situations not covered by the Code. In light of all the evidence, no rational juror could find that Hinchey

relied on the 1983 Code in making his complaints.

## V.

### *Wrongful Discharge in Violation of Public Policy*

 Massachusetts courts recognize an exception to the general at-will employment rule "when employment is terminated contrary to a well-defined public policy." *Wright v. Shriners Hosp. for Crippled Children*, 412 Mass. 469, 589 N.E.2d 1241, 1244 (1992). For example:

> Redress is available for employees who are terminated for asserting a legally guaranteed right (e.g., filing workers' compensation claim), for doing what the law requires (e.g., serving on a jury), or for refusing to do that which the law forbids (e.g., committing perjury).

*Smith–Pfeffer v. Superintendent of the Walter E. Fernald State Sch.*, 404 Mass. 145, 533 N.E.2d 1368, 1371 (1989) (relying on multiple Massachusetts precedents). Legal redress is also available for employees "terminated for performing important public deeds, even though the law does not absolutely require the performance of such a deed," *Flesner v. Technical Communications Corp.*, 410 Mass. 805, 575 N.E.2d 1107, 1111 (1991). For example, an internal or external complaint made about an alleged violation of criminal law, or "whistle blowing," falls into this category. *See Shea v. Emmanuel College*, 425 Mass. 761, 682 N.E.2d 1348, 1350 (1997). Internal matters, however, including internal policies, cannot be the basis of a public policy exception to the at-will rule. *See King v. Driscoll*, 418 Mass. 576, 638 N.E.2d 488, 492 (1994); *Smith–Pfeffer*, 533 N.E.2d at 1371–72; *Mello v. Stop & Shop Cos., Inc.*, 402 Mass. 555, 524 N.E.2d 105, 108 (1988).

 Hinchey's claim is not one for which Massachusetts courts have accorded legal redress. Although Hinchey now asserts that he was terminated for attempting to report NYNEX's antitrust and procurement abuses, Hinchey's letters to Seidenberg reveal that his report dealt only with internal matters. In essence, Hinchey's complaints amounted to no more than specific details about decisions made by NYNEX management with which Hinchey disagreed.

 Hinchey asserts that, as a "whistle blower," his termination violated public policy. *See Shea*, 682 N.E.2d at 1350. A plaintiff in these kinds of cases, however, must provide evidence—not mere assertion or speculation—supporting his claim that he was terminated for reporting criminal conduct to his superior. *See id.* Hinchey may well have established evidence sufficient for a jury to find that NYNEX terminated him based on the countless complaints he made and the animosity those complaints caused. Despite his assertions, however, there is nothing in the record demonstrating that Hinchey was terminated for reporting criminal conduct. Accordingly, summary judgment was granted appropriately on this count.

## VI.

### *Misrepresentation*

 Hinchey sets forth numerous misrepresentation claims regarding the terms of the Code and the FMP, as well as the Company's promise of net credited service and statements regarding Hinchey's career status. For Hinchey to recover for either intentional or negligent misrepresentation, he must submit evidence that NYNEX made false representations and that he reasonably relied on those misrepresentations. *See Robertson v. Gaston Snow & Ely Bartlett*, 404 Mass. 515, 536 N.E.2d 344, 349, *cert. denied*, 493 U.S. 894, 110 S.Ct. 242, 107 L.Ed.2d 192 (1989). For reasons discussed in section IV, *supra*, we find that as a matter of law, Hinchey has not provided sufficient evidence of reasonable reliance on the Code, the FMP, or promises of net credited service. *See Chedd–Angier Prod. Co. v. Omni Publications Int'l, Ltd.*, 756 F.2d 930, 939 (1st Cir. 1985).

 Regarding the career status claims, it is unclear from his brief specifically what statements Hinchey is alleging as misrepresentation. In his complaint, Hinchey stated that Castellano made two misrepresentations regarding his career status. The first allegation involved Castellano's pre-termination

promise of a separation plan including net credited service.[6] As we have noted, *supra*, Hinchey specifically informed Castellano that he was no longer interested in that plan. Accordingly, Hinchey cannot claim that he reasonably relied on a promise he rejected.

 The second allegation of misrepresentation involved Castellano's statement that Hinchey was a valued employee in good standing. Again, Hinchey has not met his burden of demonstrating reasonable reliance. As discussed in section IV, *supra*, Hinchey's assertion that he suspended higher-level review of his 1992 evaluation and terminated his search for employment are unsupported by evidence. After being informed by Castellano of his good standing at the Company on July 19, 1993, Hinchey proceeded to pursue a meeting with Seidenberg in order to discuss how the poor evaluation and lack of promotion had wounded his reputation and his chances of finding employment. Hinchey has adduced no evidence that he would have acted any differently had Castellano not made the good-standing statement.[7]

## VII.

### Conclusion

Although the standards for summary judgment are highly favorable to the nonmoving party, the nonmovant plaintiff still has a burden to produce evidence sufficient for a reasonable juror to find in his favor. Given the dearth of evidence on each of the seventeen claims, we find that Hinchey has not met that burden. The record abounds with conclusory statements and unsupported allegations, but nothing which would warrant a jury trial. While we may sympathize with an employee who devoted his time, effort, and talent to one company for twenty-eight years, we cannot accord him legal redress where it is unwarranted. Accordingly, the district court's grant of summary judgment to NYNEX is,

*Affirmed.*

---

6. Hinchey does not allege that Castellano's post-termination promise constituted a misrepresentation. *See* Compl. ¶ 110.

7. Hinchey's final claims regarding intentional and negligent infliction of emotional distress need not be analyzed. Under Massachusetts law, such actions are barred by the exclusivity provision of the Massachusetts Workers' Compensation Act. Mass. Gen. Laws Ann. ch. 152, § 24 (West Supp.1998), *construed in Green v. Wyman–Gordon Co.*, 422 Mass. 551, 664 N.E.2d 808, 813–14 (1996). These actions are not barred, however, if an employee gave written notice to his employer that he was retaining his right of action. *See* chapter 152, § 24. Hinchey has not alleged that he took any steps to retain this right.