USCA1 Opinion

 

 United States Court of Appeals For the First Circuit ____________________No. 98-1441 BRUCE MICHELSON, Plaintiff, Appellant, v. DIGITAL FINANCIAL SERVICES, A UNIT OF GENERAL ELECTRIC CAPITAL CORPORATION, Defendant, Appellee. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. Robert E. Keeton, U.S. District Judge] ____________________ Before Torruella, Chief Judge, Aldrich and Cyr, Senior Circuit Judges. _____________________ Thomas G. Waldstein, with whom Gaffin & Waldstein, was onbrief, for appellant. Barry A. Guryan, with whom Karen K. Burns, Epstein Becker &Green, P.C. and Lawrence Peikes were on brief, for appellee. ____________________ February 16, 1999 ____________________ TORRUELLA, Chief Judge. Before the Court is plaintiff-appellant Bruce Michelson's appeal of the district court's entry ofsummary judgment against his five causes of action arising out ofhis five-month employment at defendant-appellee Digital FinancialServices ("DFS"). BACKGROUND During the summer of 1994, Michelson was employed at non-party Digital Equipment Corporation ("Digital") as a StrategicAccount Business Manager assigned to Digital's General Electricaccount. In August of 1994, Jeff Amsler, General Manager of DFS,approached Michelson and asked whether he would consider employmentat DFS. Michelson then had two meetings with Mike Kelley, DFS'Director of Sales, to discuss the possibility of hiring Michelson. On August 19, 1994, Kelley, on behalf of DFS, sentMichelson a letter offering him employment for the position ofNational Account Manager ("NAM"). The letter stated thatMichelson's annual target compensation would be $150,000, whichconsisted of an $85,000 fixed salary, a $15,000 Management byObjective ("MBO") Bonus Plan, and participation in the 1994Variable Incentive Compensation ("VIC") Plan. The letter statedthat Michelson would be eligible to participate in the 1994 VICPlan and that Michelson's VIC would be $50,000 after reachingminimum volume thresholds. The letter also stated that there wasno cap on the compensation plan. Michelson claims that, in his discussions with Amsler,Kelley, and Marketing Manager Joseph Pucciarelli, many promises andrepresentations were made to him that were not included in theoffer letter. Despite provisions to the contrary in both the 1994VIC Plan and the offer letter, Michelson claims that Kelley toldhim that there was no minimum volume threshold for the 1994 VICPlan. Michelson also claims that Pucciarelli told him that hewould be pleased with his compensation package, which includedparticipation in the VIC Plan. Michelson claims that he wasassured that he would be earning more than the $225,000 that heearned annually at Digital. Michelson claims that he was promiseda company car, medical benefits, vacation, and other benefits.  Michelson formally accepted the offer of employment byletter dated August 27, 1994 and subsequently became DFS' NationalAccount Manager for the east coast territory. According to DFS,Michelson's principal responsibilities were: (1) to develop anddrive an installed base selling strategy called "roll-the-base,"which Michelson designed, and (2) to assume a leadership role ontransactions involving certain large national accounts. For theremainder of 1994, Michelson was also assigned to work with theDistrict Leasing Managers ("DLMs") in the east coast territory onclosing various deals. DFS claims that this assignment was part ofan aggressive attempt to overcome a revenue shortfall it wasexperiencing at the time. In early 1995, Michelson was transferred from the salesorganization to the marketing organization, where he reported toPucciarelli. DFS claims that Michelson's primary responsibilitiesin the marketing organization were: (1) to develop installed baseselling as a core competency of DFS, and (2) to manage the closureof transactions with several specific accounts. Michelson claimsthat, between January 1, 1995 and March 14, 1995, he initiatedsales contracts worth more than $100 million.  On March 14, 1995, DFS terminated Michelson's employment. Michelson claims that DFS terminated him in order to: (1) deprivehim of commissions owed to him, and (2) steal his knowledge,skills, and professional business. DFS claims that the terminationwas part of a downsizing prompted by unsatisfactory financialresults. DFS claims that Pucciarelli selected Michelson's positionas the marketing position to eliminate because: (1) he was unableto translate his ideas into actionable programs; (2) he did nothave a sufficiently detailed working knowledge of DFS' business;(3) he had significant and ongoing problems with other DFSemployees; and (4) the other executive in the marketing group hadmore potential to deliver revenue to DFS. After his termination, Michelson demanded the commissionsto which he claimed he was entitled for 1994 and 1995. DFS refusedto pay any commissions and refused to provide any accounting forsuch commissions. On March 13, 1996, Michelson filed the present actionagainst DFS in the Superior Court for the Commonwealth ofMassachusetts, County of Middlesex. DFS removed the action toUnited States District Court for the District of Massachusetts. After subsequent amendments to the complaint, Michelson raised fivecommon law causes of action: (1) breach of contract; (2)misappropriation; (3) fraudulent misrepresentation; (4) wrongfuldischarge; and (5) promissory estoppel. The first cause of actionalleged that DFS breached the employment contract with Michelson byrefusing to pay him any incentive compensation. The second causeof action alleged that DFS fraudulently misappropriated Michelson's"roll-the-base" selling strategy. The third cause of actionalleged that DFS made false representations to Michelson regardingthe level of incentive compensation Michelson could expect to earnwhile working for DFS. The fourth cause of action alleged that DFSwrongfully discharged Michelson by dismissing him in order todeprive him of earned and future commissions. The fifth cause ofaction alleged that DFS' promises of incentive compensation arebinding under a theory of promissory estoppel even if not part ofa binding contract. Following discovery, DFS moved for summary judgment onall causes of action, and Michelson opposed the motion. In aMemorandum and Order dated December 23, 1997, the district courtmade preliminary rulings regarding each cause of action. The courtfound that DFS made a preliminary showing that no genuine issue offact remained on any of Michelson's causes of action. The courtgave Michelson one more opportunity to produce "specific, relevantand admissible evidence" sufficient to demonstrate that a genuineof issue of fact remained. The court required that Michelson:(1) submit precise special verdict questions that identify thegenuine issues in contention; (2) explain why those questions arematerial; and (3) point to admissible evidence that could supporta favorable answer to those questions. The court cautionedMichelson against drafting questions that called for generalized,"black-box" or unexplained findings. Both parties then submittedresponses to the court's Memorandum and Order. On February 27, 1998, the district court issued aMemorandum and Order granting DFS' motion for summary judgment andentering judgment against Michelson on all five causes of action. The court found that, despite the further opportunity to presentspecial verdict questions and evidence, Michelson again failed tomeet his burden. The court found that Michelson: (1) failed topropose questions that addressed every element of his causes ofaction; (2) failed to show the materiality of most of the proposedquestions; (3) failed to propose adequately specific questions; and(4) failed to point to specific, relevant, and admissible evidencethat could answer the proposed questions in his favor. The courtthen discussed each of Michelson's claims separately and held thatMichelson failed to raise a genuine issue of material fact withregard to any of them. Final judgment was entered in favor of DFSon March 3, 1998. Michelson appeals, and we affirm. DISCUSSIONI. Waiver of Appellate Review Before we reach the merits of Michelson's appeal, we feelcompelled to address DFS' argument that Michelson has waived hisright to appellate review. DFS cites King v. Town of Hanover forthe following proposition: It is an established appellate rule that "issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived . . . . It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work . . . . Judges are not expected to be mindreaders. Consequently, a litigant has an obligation to spell out its arguments squarely and distinctly, or else forever hold its peace."116 F.3d 965, 970 (1st Cir. 1997)(quoting Willhauck v. Halpin, 953F.2d 689, 700 (1st Cir. 1991)); see also Strahan v. Coxe, 127 F.3d155, 172 (1st Cir. 1997)(citing King in support of court's decisionnot to review a claim mentioned in a statement of issues, but notargued further in the appellate brief), cert. denied, 119 S. Ct. 81(1998) and 119 S. Ct. 437 (1998); Ramos v. Roche Products, Inc.,936 F.2d 43, 51 (1st Cir.) (applying the principle that an issuewhich is mentioned on appeal but not briefed is considered waived),cert. denied, 502 U.S. 941 (1991). DFS argues that "[t]he Argument section of Michelson'sbrief is so disorganized as to be incomprehensible." DFS claimsthat Michelson has done no more than recite a series of unrelatedand unordered concepts and principles, without any meaningfulreference to his theories of recovery. DFS notes that Michelson'sanalysis is not divided into separate causes of action and thatMichelson fails to even define the elements of his claims. DFSfinally argues that Michelson's brief does not explain why thedistrict court erred in finding that he could not satisfy one ormore of the elements of his claims. While we agree with much of DFS' critique of Michelson'sarguments on appeal, we do not find that such infirmities waiveMichelson's right to appellate review. Michelson does make anattempt to discuss some of his causes of action and does make anattempt to point to the evidence which creates a genuine issue withregard to those causes of action. Therefore, we address thearguments that Michelson adequately raises and supports, with aneye towards waiver of the arguments that he does not.II. The District Court's Grant of Summary Judgment Against  Michelson's Claims Michelson argues that the district court erred inentering summary judgment against his five claims. Summaryjudgment is proper where "the pleadings, depositions, answers tointerrogatories, and admissions on file, together with affidavits,if any, show that there is no genuine issue as to any material factand that the moving party is entitled to judgment as a matter oflaw." Fed. R. Civ. P. 56(c). The moving party bears the initialburden, which may be discharged by pointing to the absence ofadequate evidence supporting the nonmoving party's case. See Hinchey v. Nynex Corp., 144 F.3d 134, 140 (1st Cir. 1998)(citing Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)). Oncethe moving party has carried this burden, the onus is on thenonmoving party to present facts that show a genuine issue fortrial. See Serrano-Cruz v. DFI Puerto Rico, Inc., 109 F.3d 23, 25(1st Cir. 1997); LeBlanc v. Great American Ins. Co., 6 F.3d 836,841-42 (1st Cir. 1993), cert. denied, 511 U.S. 1018 (1994). "[A]party opposing a properly supported motion for summary judgment maynot rest upon mere allegation or denials of his pleading, but mustset forth specific facts showing that there is a genuine issue fortrial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256(1986)(citing Fed. R. Civ. P. 56(e)). "[P]laintiff . . . [must]offer[] . . . 'significant probative evidence tending to supportthe complaint.'" Id. at 256 (quoting from First National Bank ofArizona v. Cities Service Co., 391 U.S. 253, 290 (1968)). Wereview the district court's grant of summary judgment de novo. SeeSerrano-Cruz, 109 F.3d at 25. A. Breach of Contract: Michelson's Entitlement to a VIC Award Michelson's first cause of action alleges that DFSbreached an employment contract with Michelson under whichMichelson was to receive variable incentive compensation for theyears 1994 and 1995. To succeed on his breach of contract action,Michelson must demonstrate: (1) that the parties reached a validand binding agreement with regard to variable incentivecompensation; (2) that DFS breached the terms of the VIC aspect ofthe agreement; and (3) that Michelson suffered damages from thebreach. See Coll v. PB Diagnostic Systems, Inc., 50 F.3d 1115,1122 (1st Cir. 1995). The district court found that Michelsonfailed to raise a genuine issue with regard to the first element. Michelson makes several arguments that summary judgmentwas inappropriate against this cause of action. Michelson firstclaims that DFS did not meet its burden of proof because it failedto submit any evidence to support its allegations that Michelsonwas not entitled to any commissions and benefits. What thisargument ignores is that DFS can carry its summary judgment burdenby pointing to an absence of evidence supporting Michelson's claimthat he was entitled to those commissions. See Hinchey, 144 F.3dat 140. The district court entered summary judgment againstMichelson because it found that Michelson offered no evidentiarysupport for his claim that he was entitled to VIC awards for 1994and 1995. Even assuming that DFS did not offer sufficient evidenceto show that Michelson was owed no commissions, DFS did not need todo so in order to prevail at the summary judgment stage. The rest of Michelson's arguments regarding this cause ofaction fit into two categories: (1) arguments that a contractexisted that entitled Michelson to participate in the 1994 VICPlan; and (2) arguments that Michelson satisfied the prerequisitesfor a VIC award under that contract for the last quarter of 1994. 1. Existence of a Contract That Included Variable Incentive Compensation for the Last Quarter of 1994 In its December 23, 1997 Memorandum and Order, thedistrict court found that DFS made a preliminary showing that nocontract existed that entitled Michelson to receive incentivecompensation for the years 1994 or 1995. In its February 27, 1998Memorandum and Order, the district court found that Michelsonfailed to raise a genuine issue as to whether he was offered (andsubsequently accepted) definite or certain VIC payments as part ofhis employment contract. Because the formation of a contract withsuch a term is a legal element of Michelson's breach of contractclaim, the district court entered summary judgment againstMichelson's claim. Michelson argues that a contract existed thatentitled him to receive variable incentive compensation for thelast quarter of 1994. Michelson argues that he would never have left hisprevious position in which he earned more than $225,000 if he hadnot been assured that he would be earning a great deal more withDFS. This argument fails because, as appellees point out,Michelson admits that he was not "guaranteed" a higher salary. Infact, the offer letter itself states that Michelson's targetedcompensation would be $150,000, which is substantially less thanthe $225,000 that Michelson made at his previous position. Michelson may well have left his position because he had theopportunity to earn more than this, even without guarantees that hewould earn more. In any event, this argument is merely anunsupported inference and does not constitute evidence thatMichelson was contractually entitled to VIC compensation. Therefore, this argument does not create a genuine issue thatprecludes summary judgment. However, our rejection of this argument does not meanthat no contract existed that included VIC Plan participation. TheAugust 19, 1994 offer letter from DFS stated that he would be"eligible to participate in the variable incentive compensationplan for the remainder of 1994." The letter also stated thatMichelson's compensation would consist of a fixed salary, an MBOBonus Plan, and variable incentive compensation. DFS argues thatthe letter only indicates that Michelson was eligible toparticipate in the 1994 VIC Plan, not that any benefits orprovisions of the Plan were binding. DFS argues that Michelson hasfailed to propound any evidence indicating that, in his case, theVIC Plan was a binding contractual provision. The district court agreed with DFS and found that theoffer letter could only be reasonably understood to have offeredthe opportunity to earn VIC compensation. We agree with thedistrict court to the extent that it found that Michelson had toreach a minimum sales threshold before he was entitled to receiveVIC awards under the Plan, but we do not agree with the districtcourt to the extent that it found that Michelson's participation inthe 1994 VIC Plan was not part of the contract.  The offer letter expressly stated that Michelson would beeligible to participate in the 1994 VIC Plan. In that letter,Michelson was offered the position and was informed that hiscompensation for the remainder of 1994 would consist of threecomponents: (1) a fixed base salary of $85,000; (2) an MBO bonus of$15,000; and (3) participation in the 1994 VIC Plan, with atargeted VIC award of $50,000. Michelson accepted this offer byletter dated August 22, 1994. Once the offer was accepted,Michelson's participation in the 1994 VIC Plan was as much a partof his at-will employment contract as was his base salary. Weagree with the district court that Michelson has not demonstratedthat the contract bound DFS to make "certain" payments of VIC toMichelson, in the sense that DFS was bound to pay Michelson a VICaward regardless of whether he met his minimum thresholds. Theletter expressly states that Michelson had to reach minimumthresholds to receive VIC compensation. However, the opportunityto reach those thresholds and the right to be compensated with VICif he reached them were clearly a part of the offer that Michelsonaccepted. Therefore, we find that Michelson has offered sufficientevidence to raise a genuine issue on the question of whether hisemployment contract included, as a compensation term, hisparticipation in the VIC Plan for 1994. 2. Michelson's Entitlement to a VIC Award Under the 1994 VIC Plan Even if Michelson's contract with DFS included aprovision for participation in the VIC Plan, Michelson was notentitled to receive a VIC award until he satisfied the Plan'sprerequisite of reaching the minimum sales volume threshold for thelast quarter of 1994. Michelson first argues that he was entitledto a VIC award for 1994 because he was assured after meetings withKelley that there was no minimum volume threshold for the 1994 VICPlan. However, we cannot accept Michelson's argument that nominimum threshold existed. The August 19, 1994 offer letterspecifically stated that Michelson would be eligible to participatein the VIC plan for the remainder of 1994 and that his VIC would be$50,000 after reaching minimum volume thresholds. The 1994 VICPlan itself provides that only the amount of volume over theminimum threshold will qualify for VIC payment. Additionally,Michelson repeatedly admits elsewhere that there was a minimumvolume threshold for the Plan. See, e.g., Michelson Deposition, atpage 115, lines 6-13 ("Q. What was your minimum threshold? A. Tenmillion to 12 million . . . . Mike had given me a number of $48million on an annual basis, and when you divide it by 4 [it] comesout to 12 million, but in conversations I had one on one with Mike,he talked about 10 million."); Proposed Special Verdict Questionsand Memorandum, at 2 ("Kelley agreed with Michelson to a minimumthreshold of 10-12 million dollars annually."); Appellant's Brief,at 15 (arguing that Michelson met his minimum volume thresholds);Plaintiff's Memorandum in Opposition to Defendant's Motion ForSummary Judgment, at 13 ("The offer to Mr. Michelson included acommission or variable incentive component which included . . .attainable minimum thresholds . . . ."). Thus, Michelson was onlyentitled to receive a VIC award under the employment contract andthe VIC Plan if he surpassed his minimum volume threshold. Michelson next claims that the evidence shows that he wasentitled to a VIC award because he met his minimum volumethreshold. He states that he was responsible for over $100 millionin sales, more than doubling the expected sales. However, heoffers no evidence in support of this bald assertion. Also,Michelson's brief states that he initiated this $100 million insales contracts between January 1, 1995 and March 14, 1995. Thus,even if Michelson's asserted volume is accurate, it would have noimpact on the question of whether he earned commissions for 1994.  Michelson also argues that because other sales people forwhom he was responsible received commissions, he was also entitledto a commission. Michelson argues that if those sales peoplereached their respective thresholds, then he must have reached histhreshold as well, because he was to be credited with their sales. In support of this argument, Michelson offers a table that purportsto list the 1994 compensation, including VIC awards and thresholds,of 28 DFS employees. There are several problems with thisargument. First, while the table lists the thresholds of 28employees, neither Michelson nor DFS informs the Court of whatMichelson's minimum threshold for the last quarter of 1994 was. Areview of the record reveals that Michelson apparently believedthat the minimum threshold was approximately $10-12 million. SeeMichelson Deposition, at page 115, lines 6-13. The 1994 VIC Planstates that the minimum threshold is the "booked volume target forthe measurement period," but neither party quantifies this valuefor the last quarter of 1994. Without knowing Michelson'sthreshold, it is impossible to determine if he must have reached itsimply because his subordinates reached their thresholds. Second, Michelson does not name the individuals whosesales he was responsible for or the amounts of their respectivesales. Michelson merely submits an unlabeled and undated tableindicating that 28 individuals received VIC awards for 1994,meaning that those 28 individuals must have reached theirthresholds for that period. Michelson does not inform the Court ofwhich of the listed individuals were on his "team" and which werenot. Our own review of the record reveals that, as part of aspecial year-end program, Michelson was responsible for eight ofthe 28 employees listed on the table. See Kelley Deposition, at36-37. However, neither the table nor Michelson cites any salesfigures for those eight individuals. Nor does Michelson offerevidence that his subordinates met their minimum thresholds for thefourth quarter of 1994. At best, the table indicates that thelisted individuals met their annual threshold for 1994, butMichelson was only employed for the final quarter of 1994. As aresult of all of these deficiencies, this table provides littlehelp to Michelson in proving that he or his subordinates met theirsales volume thresholds for the fourth quarter of 1994. Third, Michelson's argument is dependent upon the ideathat, in calculating his sales for VIC purposes, DFS must attributeto Michelson the sales of his subordinates. Under a practicecalled "shadowbooking," a supervisor is attributed the sales of hisor her subordinates for purposes of determining the supervisor'sown sales volume. However, as noted by DFS, Michelson offers noevidence to support the conclusion that he was contractuallyentitled to avail himself of the "shadowbooking" practice. The1994 VIC Plan makes no mention of such a practice and states thatthe interpretation of the VIC Plan rests entirely with DFSmanagement. In his deposition, Kelley notes that the"shadowbooking" practice was considered for the year-end program,but that Amsler, consistent with his role in interpreting the VICPlan, decided that the financial results were insufficient tojustify "shadowbooking" any of the National Account Managers. InMichelson's deposition, he claims that his understanding was thathe would be "shadowbooked" by the sales people for the eastterritory, but he points to no contract or DFS policy that entitledhim to such a practice. Michelson does not even allege that anyoneat DFS told him that his sales would be calculated using the"shadowbooking" procedure. Nor does he offer any evidence orargument that Amsler did not have the authority to exercise thediscretion that he did. Therefore, we do not find that Michelson's"shadowbooking" argument raises a genuine issue of fact regardingwhether Michelson was entitled to commissions for the fourthquarter of 1994. Michelson next offers an undated, handwritten letter fromKelley to Amsler in which Kelley allegedly recommended thatMichelson receive a commission. However, in the letter, Kelley didnot recommend Michelson for a VIC award; he recommended him for anMBO bonus, which has no bearing on the VIC calculations. Moreover,even if Kelley had recommended that Michelson receive a VIC award,Kelley's recommendation would not provide Michelson with anycontractual rights. Michelson next argues that Kelley confirmed inthe letter that Michelson had participated in $9 million infundings in one particular program. However, the letter does notlimit this number to one particular program; what the letteractually states is that Michelson participated in $9 million worthof fundings for the fourth quarter of 1994. Since the onlyevidence of the amount of Michelson's threshold is his owntestimony that it was $10-$12 million, this statement thatMichelson participated in only $9 million does not help him. Michelson claims that this number represents only a portion of hisresponsibility, but he does not quantify the sales or fundings fromany of his other alleged responsibilities. Additionally, ifMichelson is correct that this represents only a portion of hisresponsibilities, the context of the statement in the letterindicates that the portion to which Kelley refers is thesupervision of his team of sales people. As noted above, Amslerwas not contractually obligated to credit Michelson with salesresulting from his supervision of the team. Thus, this letteroffers little assistance to Michelson. In sum, while Michelson has raised a genuine issueregarding whether his contract included participation in the 1994VIC Plan as part of his compensation, Michelson has not raised agenuine issue regarding whether he had actually satisfied theeligibility prerequisites for any VIC payments under the Plan. Therefore, summary judgment was properly entered againstMichelson's breach of contract cause of action claiming that DFSfailed to pay him VIC compensation. B. Promissory Estoppel Under Massachusetts law, "[a] promise which the promisorshould reasonably expect to induce action or forbearance on thepart of the promisee or a third person and which does induce suchaction or forbearance is binding if injustice can be avoided onlyby enforcement of the promise." Hinchey, 144 F.3d at 143 (quotingVeranda Beach Club Ltd. Partnership v. Western Sur. Co., 936 F.2d1364, 1380 (1st Cir. 1991)).  Michelson makes only a short reference to his promissoryestoppel cause of action in his brief. Citing Hall v. HorizonHouse Microwave, Inc., 506 N.E.2d 178, 184 (Mass. App. Ct. 1987),Michelson argues that an element of promissory estoppel is that theparty invoking it must have reasonably relied on the allegedpromise to his detriment. Michelson claims that he reasonablyrelied to his detriment on his managers' promises, by leaving hisprevious position and by using all of his skills, talents, andknowledge in order to accumulate large amounts of sales. The district court found that Michelson's promissoryestoppel claim failed as a matter of law for the same reasons thebreach of contract action failed: there was no definite offer forpayment of a certain amount of VIC. See February 27, 1998Memorandum and Order, at 9. As noted in our discussion above, wefind that there was a definite offer to make VIC compensation partof Michelson's employment, and we find that this offer wasaccepted, but we do not find that DFS breached the resultingemployment contract. Participation in the 1994 VIC Plan was partof Michelson's employment; Michelson just could not take advantageof this participation because he did not meet his thresholds. Therefore, unless Michelson can demonstrate a promise other thanparticipation in the 1994 VIC Plan that he reasonably relied on tohis detriment, his promissory estoppel claim fails. It is possible that Michelson based his promissoryestoppel cause of action on a promise other than the promise of VICPlan participation. Besides the contractual promise ofparticipation in the 1994 VIC Plan, there are four alleged promisesor sets of promises from DFS management that Michelson refers to inhis brief. First, he claims that "he was assured that there was nominimum threshold for the incentive compensation plan" and that "hewas entitled to compensation for all volumes of sales." Second,Michelson claims that he was told by Pucciarelli that he would bepleased with his compensation package, which included the VIC Planparticipation. Third, Michelson claims that he "was promised a[n]$85,000.00 base salary, a $15,000 payment in February . . . underthe Management by Objective (MBO) plan, plus commission based uponsales under the VIC program, a company car, medical benefits,vacation, and other benefits." Finally, Michelson claims that hewas promised "that there was no cap on the amount of commissionMichelson could earn." The first alleged promise does not raise a genuine issueof material fact for two reasons: (1) Michelson admits that he wastold his threshold would be between $10 million and $12 million,and (2) the 1994 VIC Plan itself, which Michelson reviewed prior toaccepting the position, indicates that minimum thresholdrequirements applied to the calculation of VIC awards. The formerreason negates any genuine issue regarding whether the promise wasactually made. See Colantuoni v. Alfred Calcagni & Sons, Inc., 44F.3d 1, 4-5 (1st Cir. 1994) ("When an interested witness has givenclear answers to unambiguous questions [in his depositiontestimony], he cannot create a conflict and resist summaryjudgment with an affidavit that is clearly contradictory, but doesnot give a satisfactory explanation of why the testimony ischanged."). The latter reason makes it clear that any reliance onsuch a promise would not have been reasonable without furtherinquiry and assurances from DFS. See McMahon v. Digital EquipmentCorp., 162 F.3d 28, 39 (1st Cir. 1998) (finding reliance to beunreasonable as a matter of law "where a written statementconflicts with an oral statement," because "Massachusetts lawassumes that a reasonable person will investigate further"); Coll,50 F.3d at 1124 ("Where a written statement conflicts with a priororal representation, reliance on the oral representation isgenerally held to be unreasonable."). The second alleged promise -- Pucciarelli's promise thatMichelson would be pleased with his compensation package, whichincluded the VIC participation -- fares no better. As noted above,the promise of VIC participation was not breached, and the promisethat Michelson would be pleased with his compensation package canhardly be described as a binding "promise." A promissory estoppelcause of action demands a promise involving "commitment," or the"manifestation of an intention to act or refrain from acting in aspecified way." Rhode Island Hosp. Trust Nat. Bank v. Varadian,647 N.E.2d 1174, 1179 (Mass. 1995). The type of promise attributedto Pucciarelli evidences no intent to be bound and consists of nomore than the type of "inconclusive" and "inchoate negotiations"that Massachusetts courts have found to be insufficient. See Hall,506 N.E.2d at 184; see also Santoni v. Federal Deposit Ins. Corp.,677 F.2d 174, 179 (1st Cir. 1982) (stating that the promise must be"definite and certain" so that the promisor should foresee that itwould induce reliance by the promisee). Additionally, any relianceon this vague representation that Michelson would be "pleased" iscertainly not reasonable.  With regard to the third set of promises, Michelson doesnot allege that he was denied any of the benefits promised, otherthan a VIC award. The record does not reflect any evidence thatMichelson was deprived of his base salary, his MBO bonus, hiscompany car, medical benefits, or vacation. The same is true ofthe fourth alleged promise that there was no cap on the amount ofcommissions Michelson could earn. Michelson does not allege thathe was hampered by the imposition of a cap on VIC awards. Thus,even if he had a claim that this promise should be enforced onestoppel grounds, he has not alleged that DFS breached thatpromise.  In sum, none of the promises alleged by Michelson cansupport a promissory estoppel cause of action. Therefore, thedistrict court properly entered summary judgment against thisclaim. C. Wrongful Discharge Michelson's wrongful discharge claim alleges that hisemployment was terminated without cause in order to deprive him ofearned and future income, in the form of incentive compensation. Michelson cites Fortune v. National Cash Register Co., 364 N.E.2d1251, 1257 (Mass. 1977), for the proposition that an employer maynot terminate an at-will employee for the purpose of depriving theemployee of compensation that the employee had already earned andwhich, with the mere passage of time, would have become payable. The court in Fortune held that the implied covenant of good faithand fair dealing is breached where an employer terminates an at-will employee in order to deprive the employee of any portion of acommission already earned but not yet payable. See id.; see also Coll, 50 F.3d at 1125 (citing Fortune and stating that "[u]nderMassachusetts law, the implied covenant of good faith and fairdealing prohibits an employer from terminating an employee in orderto deprive him of a benefit to which he is entitled"). In Gram v.Liberty Mut. Ins. Co., 429 N.E.2d 21, 29 (Mass. 1981), the SupremeJudicial Court of Massachusetts extended this obligation to imposeliability on an employer who terminated an employee without goodcause and for the purpose of appropriating the employee'scommissions that were "reasonably ascertainable future compensationbased on his past services." The Gram court stated that theemployer's obligation of good faith and fair dealing requires thatthe employer be liable for a "loss of compensation that is soclearly related to an employee's past service, when the employee isdischarged without good cause." Id.; see also Coll, 50 F.3d at1125 (citing Gram, 429 N.E.2d at 27-29). Thus, in order to succeedon this claim, Michelson must prove that DFS terminated him withoutgood cause and in bad faith in order to deprive him of commissionsthat have already been earned or were reasonably ascertainablebased on past services.  The district court found that Michelson failed to raisea genuine issue on the question of whether DFS acted in bad faith. See February 27, 1998 Memorandum and Order, at 12-13. The courtheld that Michelson merely proposed verdict questions that calledfor a "black-box" finding of bad faith without pointing to specificadmissible evidence to support such a determination. See id. at13. Michelson argues that he was terminated without goodcause in order to deprive him of the commissions owed to him underhis employment contract. As we have already stated, Michelson hadnot earned any commissions under the 1994 VIC Plan, and Michelsonhas not demonstrated that he had earned any commissions for 1995. Thus, even if, as Michelson alleges, he was terminated without goodcause, he has not raised a genuine issue with regard to whether DFSdid so in order to deprive him of such commissions. Therefore, thedistrict court did not err in entering summary judgment againstMichelson's wrongful discharge cause of action. D. Fraudulent Misappropriation and Fraudulent Misrepresentation In addition to the three causes of action discussedabove, Michelson's complaint contained two other causes of action:(1) misappropriation and (2) fraudulent misrepresentation. Thedistrict court entered summary judgment against Michelson'smisappropriation cause of action because he failed to raise agenuine issue as to whether the GE Capital Employee ProprietaryInformation Agreement conferred proprietary rights to the "roll-the-base" sales strategy on DFS. See February 28, 1998 Memorandumand Order, at 10-11. The district court entered summary judgmentagainst Michelson's fraudulent misrepresentation cause of actionbecause he failed to raise a genuine issue as to whether hisreliance on DFS' alleged misrepresentation that Michelson was goingto earn more with DFS than with his previous employer wasreasonable. See id. at 11-12. Michelson does not discuss eitherof these grounds for summary judgment or even these causes ofaction in his brief, so any claim of error is waived. See King,116 F.3d at 970. CONCLUSION Based on the foregoing, the district court's entry ofsummary judgment against Michelson's claims is AFFIRMED.