Michael **HURLEY**, Plaintiff,

v.

**MODERN CONTINENTAL CONSTRUCTION COMPANY, INC., Charles Madden, Individually and as Senior Vice President of Modern Continental Construction Company, Inc., Defendants.**

**No. Civ.A. 94–11373–RBC.[1]**

United States District Court,
D. Massachusetts.

July 19, 1999.

---

1. With the parties' consent, this case has been referred and reassigned to the undersigned for all purposes, including trial and the entry of judgment, pursuant to 28 U.S.C. § 636(c).

Ellen J. Messing, Messing & Rudavsky, PC, Boston, MA, for Michael Hurley, plaintiff.

Richard D. Wayne, Hinckley, Allen & Snyder, Boston, MA, for defendants.

## MEMORANDUM AND ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (# 173)

COLLINGS, Chief United States Magistrate Judge.

### I. INTRODUCTION

In early July, 1994, plaintiff Michael Hurley ("Hurley") filed a two-count complaint naming as parties defendant his former employer, Modern Continental Construction Company, Inc. ("Modern Continental"), and one Charles Madden, both individually and in his capacity as Senior Vice President of Modern Continental. Hurley claims that Modern Continental terminated him in violation of the provisions of the Americans With Disabilities Act, 42 U.S.C. §§ 12101 *et seq.*, and state anti-discrimination law, specifically Massachusetts General Laws chapter 151B § 4(16). Madden is alleged to have aided and abetted in Modern Continental's discriminatory action in violation of Massachusetts General Laws chapter 151B § 4(5).

Although the plaintiff's claims are relatively circumscribed, the pretrial process has been somewhat of an odyssey in this litigation. At this juncture, however, discovery is closed. The defendants have filed a motion for summary judgment (# 173) together with a memorandum of law (# 174), a statement of facts (# 175), and an exhibit list (# 176). Hurley then submitted a memorandum in opposition (# 191), a statement of facts (# 192), an Affidavit Of Ellen J. Messing Pursuant To

Fed.R.Civ.P. 56(f) (# 193), and exhibits to plaintiff's statement of material facts (# 196). Thereafter, a reply to the plaintiff's opposition (# 198) was filed by Madden and Modern Continental. Two days later the plaintiff filed a motion for leave to file a sur-reply (# 201) which was allowed on February 18, 1999.[2] In April, 1999, Hurley sought leave to submit a supplement to his opposition to the summary judgment motion (# 218); Modern Continental and Madden opposed that motion(# 222). Over the defendants' objection leave to file was granted on May 4, 1999, and the brief supplement (# 224) was docketed.

The Supreme Court's decisions released on June 22, 1999, prompted the issuance of a Procedural Order (# 228) on June 24th wherein briefing on the question of what, if any, impact those cases had on the motion for summary judgment was requested. In response, the plaintiff filed a memorandum of law (# 230) and a motion for certification (# 231). The defendants also duly filed a submission (# 233). Oral argument was heard on July 13, 1999. With the record now complete, the defendants' dispositive motion is in a posture for decision.

## II. THE FACTS

In large measure, the historical facts underlying the relevant events in this case are not in controversy. However, to the extent that any facts are disputed, it shall be duly noted in this recitation. By the same token, of course, the facts shall be viewed in the light most favorable to the non-moving party.

At the outset, introduction of the players is in order. On April 13, 1992, Hurley, a Massachusetts resident, was hired by Modern Continental to work as a project engineer for the defendants' Deer Island construction project. (Complaint # 1

¶ IV1; Answer # 2 ¶ IV1) At the time he was offered the position, Hurley was considered by Modern Continental to be qualified to perform the duties as a project engineer. (# 1 ¶ IV2; # 2 ¶ IV2)[3] Indeed, the parties agree that during his tenure with Modern Continental the plaintiff's work performance was fully satisfactory. (# 1 ¶ IV3; # 2 ¶ IV2)

Modern Continental is a Massachusetts corporation with a principal place of business in Cambridge, Massachusetts. (# 1 ¶ III2; # 2 ¶ III2) There is no apparent dispute that

> [Modern Continental] is a heavy and highway union construction company. During 1992–1993, [Modern Continental] bid and performed work exclusively on large public works contracts with public agencies such as the Massachusetts Highway Department, the Massachusetts Bay Transit Authority, the Massachusetts Port Authority, and the Massachusetts Water Resource Authority.

List Of Exhibits # 176, Exh. S, Affidavit of Charles F. Madden at ¶ 2. The defendant company appears uniformly to be assessed in the following manner:

> they pride themselves on what they do, and they are pretty demanding as far as what they expect out of their employees . . . So they are aggressive. They want to get the job done right. They want to be ahead of schedule and under budget. So there's a lot of pressure on you [an employee] as far as performance is concerned.

List Of Exhibits # 176, Exh. E, Deposition of Joseph P. Toffoloni at 76–7; Exh. D, Deposition of Kelly Murphy at 65–6; Exh. F, Deposition of Michael Seaver, at 309–40; Exh. G, Deposition of Robert Shepard at 62–3.

2. The sur-reply brief was docketed as # 204.

3. The plaintiff holds as Associate's Degree in Science, building construction, an Associate's Degree in Engineering, architectural engineering, and a Bachelor's Degree in construction management all awarded from Wentworth Institute of Technology. (List Of Exhibits # 176, Exh. A, Deposition of Michael J. Hurley at 34)

Madden, a Massachusetts resident, serves as the Executive Vice President of Modern Continental. (# 1 ¶ III3; # 2 ¶ III3; # 176, Exh. C, Deposition of Charles F. Madden at 16) His duties essentially involve acting as "a special assistant to the president" of the company. (# 176, Exh. C at 16; # 192 ¶ 10)

In or about 1992 Modern Continental was awarded a substantial public works contract by the Massachusetts Water Resources Administration ("MWRA") to be the general contractor for work to be performed on the MWRA Deer Island water treatment facility.[4] (Defendants' Concise Statement Of Material Facts # 175 ¶ 12[5]) The MWRA contracted with Kaiser Engineering ICF of Massachusetts, Inc. ("Kaiser") to be the Construction Manager of the Boston Harbor Project. (# 175 ¶ 13) In other words, Kaiser supervised Modern Continental and all the other contractors working on the harbor cleanup project. (# 175 ¶ 14) The Modern Continental management hierarchy on Deer Island was as follows: four engineers reported to the plaintiff. (# 175 ¶ 17) The project manager, Steven Harrington ("Harrington"), was the plaintiff's supervisor; Harrington, in turn, was accountable to defendant Madden. (# 175 ¶ 16; # 192 ¶ 11)

In a nutshell, the project engineer's job was to make sure that all the "work performed by [Modern Continental] personnel and subcontractors, as well as all material supplied by vendors, met the contractual engineering specifications of the Deer Island Project." (# 176, Exh. T ¶ 3) According to the defendants:

The essential functions of Project Engineer at the Deer Island project included, but were not limited to: Supervising and assigning work to a staff of four assistant engineers; coordinating, approving and forwarding submittals to Kaiser Engineering; processing change/clarification reports between either [Modern Continental] personnel, subcontractors or vendors and Kaiser Engineering; processing, approving and forwarding shop drawings to Kaiser Engineering; receiving shop drawings back from Kaiser and distributing them to the subcontractors or [Modern Continental] personnel; analyzing the contract plans for the project for engineering feasibility; monitoring the progress of the project; monitoring the work of subcontractors to assure compliance with the design specifications; scheduling the work of the field staff; attending various project meetings including [Modern Continental] staff meetings, subcontractors meetings, and meetings with Kaiser Engineering and the project's owners.

List Of Exhibits # 176, Exh. T, Affidavit of Steven Harrington ¶ 4. As the project engineer, Hurley regularly worked ten to twelve hour days. (# 176, Exh. A at 398) The plaintiff described Kaiser as being "excessively demanding", which, coupled with the long hours, created a high stress level at the Deer Island job. (# 176, Exh. A at 141, 335)

Prior to mid–1990, Hurley was physically well and, in fact, enjoyed an active and athlete lifestyle. (# 176, Exh. A at 265, Exhibits To Plaintiff's Statement # 196, Exh. 40, 37) According to the plaintiff's medical records, in August, 1990,

[a]pproximately 30 minutes after vigorous exercise he experienced a brief period of lightheadedness and then loss of consciousness while walking. Evaluation at Mass. General Hospital at that time consisted of a reportedly normal echocardiogram and exercise tolerance

---

4. This was part of the Boston Harbor Clean Up Project. (Defendants' Concise Statement Of Material Facts # 175 ¶ 12)

5. In their respective statements, the parties cite to proffered evidence in support of their proposed facts. Throughout this recitation, particularly when the proposed facts are not challenged, reference shall be frequently made to the paragraphs of the statements, not to the foundational materials.

test. The episode was felt secondary to dehydration.

List Of Exhibits #176, Exh. I, Comprehensive Intracardia Electrophysiology Study; #190, Exh. 40.

Two years thereafter "[i]n August of 1992 while at work during a reported stressful situation, [Hurley] experienced severe lightheadedness lasting several seconds in duration without true loss of consciousness." (*Id.*) Only three months later, "[o]n November 9, 1992 again while working as a field engineer at a construction site, [the plaintiff] was talking with colleagues he (sic) experienced a witnessed sudden loss of consciousness." (*Id.*) He was taken by ambulance to the Winthrop Hospital and, when it was determined that he had not had a heart attack, he was transferred to Beth Israel Hospital in Boston. (*Id.*)

After extensive medical testing, Hurley was diagnosed as suffering from "idiopathic ventricular tachycardia"[6] which caused his dizziness and loss of consciousness. (#176, Exh. I; #190, Exh. 40) The recommended treatment of choice for this cardiac ailment was the implantation of an internal defibrillator which would serve "to shock the heart electrically whenever ventricular tachycardia should occur in (sic) attempt to convert the ventricular tachycardia to a regular normal heart rhythm." (#176, Exh. I; #196, Exh. 38) Hurley underwent the surgery to have the cardiac defibrillator implanted on January 5, 1993. (#196, Exh. 37, 38, 41)

From the time that Hurley was initially hospitalized in November, 1992 through the end of January, 1993, he was in weekly telephone contact with Harrington in order to provide updates on his medical condition. (#176, Exh. A at 153–55, 160) During this period, although Modern Continental had no established sick leave policy, the company continued to pay Hurley his salary. (#176, Exh. A at 153; Exh. B at 124) The decision to maintain the plaintiff on the payroll was made by Harrington and Madden. (#176, Exh. B at 124; #192 ¶ 11)

As a consequence of having the defibrillator implanted, the plaintiff's work capacity is restricted

> by the necessity that he avoid environments where high electrical, magnetic or other forms of radiant energy exist, since such exposure might either prematurely trigger or deactivate this protective device and allow a triggered bout of ventricular tachycardia to persist in an untreated state.

Exhibits To Plaintiff's Statement #196, Exh. 38.

In addition

> [b]ecause Mr. Hurley continues to have an inherent susceptibility to the spontaneous development of ventricular tachycardia and may have short periods of partial or complete loss of consciousness prior to the detection and conversion of this abnormal rhythm by the defibrillator device implanted on January 5, 1993, he should avoid strenuous physical exertions, sudden acute emotional upsets such as a heated argument, operating heavy machinery or automatic power tools where he might harm himself or others should he suddenly without warning develop a bout of ventricular tachycardia with loss of consciousness, and walking on scaffolding, roofs, ascending ladders, or working in other situations where a sudden loss of consciousness might result in fall from a height.

Exhibits To Plaintiff's Statement #196, Exh. 37.

Hurley was also advised by his doctors to "minimize [his] level of stress." (#176,

---

**6.** As defined by one of plaintiff's experts, [v]entricular tachycardia is a disorder during which the heart beats at such an extremely fast rate that there is an inability to fill the heart chambers with sufficient blood between contractions to allow an output adequate to maintain bodily functions.
Exhibits To Plaintiff's Statement #196, Exh. 38.

Exh. A at 95)[7]

During his period of recuperation, the plaintiff told Harrington in the course of one of their telephone conversations that he "couldn't return to the [Deer Island] project due to the extreme level of stress that we were dealing with and working under on the island." (# 176, Exh. A at 179) Harrington arranged a January 27, 1993 meeting between himself, Hurley and Madden to discuss the plaintiff's situation. (# 176, Exh. A at 179–80) Hurley testified that at the meeting he explained his medical condition to Madden and, among other things,

> I discussed what options I thought might be available for working in other areas of the company. I informed him that I didn't feel that I could return to Deer Island at that time due to the level of stress, primarily.

> I also informed him of the other concerns that have been addressed and outlined to me; such as, the electrical fields and being aboveground on higher floors, and I believe we had also discussed being paid and my salary while I was making a decision to have the surgery and then having the surgery.

> \*　　\*　　\*　　\*　　\*　　\*

> I don't recall if I indicated [that I might not be able to continue in construction] to him. I may have talked about that as a possibility. I was trying to bring about different suggestions as to what I could do within the company without having to necessarily return to Deer Island.

> I came up with thoughts of working within the estimating department or

possibly in the safety area within the company.

List Of Exhibits # 176, Exh. A at 181–82.

The plaintiff also told Madden that he was going on a trip to the Cayman Islands. (# 176, Exh. A at 182) The January 27th meeting ended with Madden counseling Hurley to take his vacation and complete his recuperation, and thereafter another meeting would be scheduled. (# 176, Exh. A at 182–83)

When the plaintiff returned from the Caribbean he got in touch with Harrington who then set up a second meeting which took place on or about February 10, 1998. (# 176, Exh. A at 183–85) The attendees at that meeting were Hurley, Madden, Harrington, Peter Grela and Kelly Murphy.[8] (# 176, Exh. A at 185) Hurley testified that:

> The same subjects discussed during the first meeting were reviewed, and again I mentioned the options of working within another area of the company; such as, estimating or safety or whatever might be available, and I probably stated again that I didn't feel I could return to Deer Island due to the level of stress that we were dealing with at that project.

List Of Exhibits # 176, Exh. A at 185.

The plaintiff further stated at his deposition:

> I didn't believe at the time of the meetings with Mr. Madden and Mr. Harrington that it was my position to suggest to him what he should be doing for me in order that I may remain at Deer Island.

> I expected him, Mr. Madden, to come back during our second meeting with a different proposal than the one that I

---

7. In a March 2, 1993 letter, one of the plaintiff's doctors wrote: "The fact that Mr. Hurley has only had cardiac arrest while at work, and has had premonitory symptoms at different times related to stressful work situations, does prompt me to recommend against continuing his present position." (# 176, Exh. J)

8. According to the defendants, Mr. Grela was the Modern Continental controller who oversaw payroll practices while Ms. Kelly was the Modern Continental employee who was in charge of insurance and other benefits. (# 175 ¶ 63)

had received, which was termination from the company.

I expected during the second meeting after our first discussions that Mr. Madden would make the efforts to restructure the position or whatever.

List Of Exhibits # 176, Exh. A at 337.

Although there were no openings at the time for these jobs, the functions of the estimator and safety officer positions were discussed along with their concomitant stress levels. (# 175 ¶¶ 67, 68, 69, 71) The upshot of the meeting was that

> Madden concluded that since Hurley could not return to his position, he was going to stop Hurley's salary and suggested Hurley investigate [Modern Continental's] long term disability plan with Kelly Murphy to see if it could be used as a means of continuing income.

Defendants' Concise Statement Of Material Facts # 175 ¶ 76.

By letter dated February 19, 1993, Madden wrote to Hurley "to confirm the highlights" of that second meeting, which included the facts that the plaintiff was no longer considered an employee of Modern Continental, that he should explore long-term disability benefits under the company's plan and that he would "have the opportunity to continue to participate in the company's group health insurance for the period allowed by federal law." (# 196, Exh. 6)

On or about March 29, 1993, Hurley filed a charge of employment discrimination on the basis of disability with the Equal Employment Opportunity Commission. (# 196, Exh. 6) The instant federal lawsuit followed.

This factual summary suffices to set the stage. Further facts shall be added, as necessary, during the course of the legal discussion.

## III. THE SUMMARY JUDGMENT STANDARD

Summary judgment is "a device that 'has proven its usefulness as a means of avoiding full-dress trials in unwinnable cases, thereby freeing courts to utilize scarce judicial resources in more beneficial ways.'" *Mullin v. Raytheon Co.*, 164 F.3d 696, 698 (1 Cir., 1999) (quoting *Mesnick v. General Electric Co.*, 950 F.2d 816, 822 (1 Cir., 1991)). The party moving for summary judgment "bears the initial burden, which may be discharged by pointing to the absence of adequate evidence supporting the nonmoving party's case." *Michelson v. Digital Financial Services*, 167 F.3d 715, 720 (1 Cir., 1999). After the moving party has met its burden, "the onus is on the nonmoving party to present facts that show a genuine issue for trial." *Id.*

When considering whether to grant summary judgment, the Court must determine whether:

> ... the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is a genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Fed.R.Civ.P. 56(c).

In making this assessment, the Court must "accept all reasonable inferences favorable to the nonmovant." *Mullin*, 164 F.3d at 698; *see also Feliciano v. State of Rhode Island*, 160 F.3d 780, 788 (1 Cir., 1998); *Hinchey v. NYNEX Corp.*, 144 F.3d 134, 140 (1 Cir., 1998); *Dykes v. DePuy, Inc.*, 140 F.3d 31, 33 (1 Cir., 1998).

A factual dispute which is neither "genuine" nor "material" will not survive a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In deciding whether a factual dispute is "genuine," the Court must determine whether the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id.; see also Fajardo Shopping Center, S.E., v. Sun Alliance Insurance Company of Puerto Rico, Inc.*, 167 F.3d 1, 7 (1 Cir., 1999) ("[A]n issue is 'genuine' if the evidence presented is such that a rea-

sonable jury could resolve the issue in favor of the nonmoving party"); *De–Jesus–Adorno v. Browning Ferris Industries of Puerto Rico*, 160 F.3d 839, 841–42 (1 Cir., 1998) ("A trialworthy issue exists … [if] the evidence is 'sufficiently open-ended to permit a rational factfinder to resolve the issue in favor of either side.'"); *Feliciano*, 160 F.3d at 784; *Hodgens v. General Dynamics Corp.*, 144 F.3d 151, 158 (1 Cir., 1998) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). In weighing whether a factual dispute is "material," the Court must examine the substantive law of the case, because "only disputes over the facts that might affect the outcome of the suit under governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505; *see also De–Jesus–Adorno*, 160 F.3d at 841–42 ("A trialworthy issue exists if the evidence is such that there is a factual controversy pertaining to an issue that may affect the outcome of the litigation under the governing law"); *Fajardo Shopping Center, S.E.*, 167 F.3d at 7 (citing *Pagano v. Frank*, 983 F.2d 343, 347 (1 Cir., 1993)). "Thus the substantive law defines which facts are material." *Sanchez v. Alvarado*, 101 F.3d 223, 227 (1 Cir., 1996) (citing *Anderson*, 477 U.S. at 247–48, 106 S.Ct. 2505).

Rule 56 does not permit the party opposed to the summary judgment motion to rest upon the mere allegations or denials in its own pleadings. *See Mullin*, 164 F.3d at 698 (quoting *Wynne v. Tufts Univ. Sch. of Med.*, 976 F.2d 791, 794 (1 Cir., 1992), *cert. denied*, 507 U.S. 1030, 113 S.Ct. 1845, 123 L.Ed.2d 470 (1993)) ("Its essential role is to 'pierce the boilerplate of the pleadings and assay the parties proof in order to determine whether trial is actually required.'"). Rather, Rule 56(c):

> mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which the party will bear the burden of proof at trial.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

## IV. DISCUSSION

### A. Has Hurley Proffered Sufficient Evidence Of A "Disability" As That Term Is Used in the Americans With Disabilities Act?

The defendants assert that taking the evidence in the light most favorable to him, Hurley has failed, in the words of the Supreme Court in the *Celotex* case, to "make a showing sufficient to establish the existence of an element essential to [his] case and on which [he] will bear the burden of proof at trial," *Celotex*, 477 U.S. at 322, 106 S.Ct. 2548, namely, that he is "disabled" as that term is used in the Americans With Disabilities Act ("ADA"). It is clear that in order to prevail at trial, Hurley must prove by a preponderance of the evidence that he is disabled. *Criado v. IBM Corporation*, 145 F.3d 437, 441 (1 Cir., 1998); *see also Laurin v. Providence Hospital*, 150 F.3d 52, 56 (1 Cir., 1998).

> By definition under federal law
>
> The term "disability" means, with respect to an individual—
>
> (A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;
>
> (B) a record of such impairment; or
>
> (C) being regarded as having such an impairment.

Title 42 U.S.C. § 12102(2).

In opposing the motion for summary judgment, Hurley claims that there is sufficient evidence for a jury to find that he has "… a physical … impairment that substantially limits one or more of [his] major life activities." *Id.*

The Supreme Court has utilized a three step inquiry to determine whether a claimant has a disability within the meaning of

the ADA. *Bragdon v. Abbott*, 524 U.S. 624, 118 S.Ct. 2196, 2202, 141 L.Ed.2d 540 (1998). First, does the claimant have a physical impairment? Second, what is the life activity the claimant asserts is limited and is it a major life activity? Third, does the impairment substantially limit the major life activity? *Id.*

With respect to the first step, the defendants concede that Hurley suffers from a physical impairment, to wit, idiopathic ventricular tachycardia. With respect to the second, Hurley claims that the "substantial life activity" which is limited is the activity of "working." Since there has been no issue raised by the parties in the instant case as to whether working can be considered to be a "major life activity", I shall assume without deciding that it is, following the Supreme Court's disposition of the issue in *Sutton v. United Air Lines, Inc.*, —— U.S. ——, 119 S.Ct. 2139, 2150, —— L.Ed.2d —— (1999) and shall apply the EEOC regulations, discussed, *infra*, assuming that they are reasonable. *Id.*

The major life activity alleged to be affected in this case is that of working. Less than one month ago the Supreme Court determined that:

When the major life activity under consideration is that of working, the statutory phrase "substantially limits" requires, at a minimum, that plaintiffs allege they are unable to work in a broad class of jobs. Reflecting this requirement, the EEOC uses a specialized definition of the term "substantially limits" when referring to the major life activity of working:

"significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities. The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working." § 1630.2(j)(3)(i).

The EEOC further identifies several factors that courts should consider when determining whether an individual is substantially limited in the major life activity of working, including the geographical area to which the individual has reasonable access, and "the number and types of jobs utilizing similar training, knowledge, skills or abilities, within the geographical area, from which the individual is also disqualified." § 1630.2(j)(3)(ii)(A), (B). To be substantially limited in the major life activity of working, then, one must be precluded from more than one type of job, a specialized job, or a particular job of choice. If jobs utilizing an individual's skills (but perhaps not his or her unique talents) are available, one is not precluded from a substantial class of jobs. Similarly, if a host of different types of jobs are available, one is not precluded from a broad range of jobs.

*Sutton*, —— U.S. ——, 119 S.Ct. 2139, 2150, —— L.Ed.2d ——.

Thus, in a case such as this in which the alleged "major life activity" is working, Hurley must prove that he is " . . . unable to work in a broad class of jobs." *Id.* More specifically, he must prove that he is " . . . significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities." *Sutton*, —— U.S. ——, 119 S.Ct. 2139, 2150, —— L.Ed.2d ——.

In my opinion, when viewed in the light most favorable to him, the evidence produced in the record on summary judgment is insufficient to enable a jury to find by a preponderance of the evidence such a significant restriction. First, there is insufficient evidence upon which a determination can be made as to the jobs which " . . . the average person having comparable training, skills and abilities" would be able to perform. *Sutton*, —— U.S. ——, 119 S.Ct. 2139, 2150, —— L.Ed.2d ——. Second, there is insufficient evidence upon

which a jury could find that he is "significantly restricted in his ability to perform a class of jobs or a broad range of jobs in various classes" that the average person in his field would perform. *Sutton,* —— U.S. ——, 119 S.Ct. 2139, 2150, —— L.Ed.2d ——. Third, there is no evidence as to the "geographical area to which [Hurley] has reasonable access." *Id.* Fourth, there no evidence as "the number and type of jobs, utilizing similar training, knowledge, skills or abilities within the geographic area ..." *Id.*

These conclusions follow inexorably from a review of the evidence which has been submitted respecting whether Hurley is disabled. A review of that evidence, in the light most favorable to Hurley, is in order.

The evidence reflects that the plaintiff holds three post-high school degrees, two Associate's degrees and one Bachelor's degree. (# 176, Exh. A at 34) Prior to being hired by Modern Continental, Hurley was employed at Carlson Corporation in the capacity as a project manager and then thereafter in a comparable capacity as a project manager/project superintendent at Sherwood Construction Corporation. (# 176, Exh. A at 111–16) In these positions the plaintiff was variously responsible for

> [c]ontract negotiation, administrative duties on a daily basis with owners and subcontractors, architects and engineers, conducting project meetings, reporting to the office as to the project status, working in conjunction with the senior project manager, who is also on-site.

List Of Exhibits # 176, Exh. A at 117.

Moreover, it was also part of Hurley's duties to supervise anywhere from ten to thirty subcontractors on a project at any one time. (List Of Exhibits # 176, Exh. A at 114–15) These job duties and responsibilities were "[v]irtually identical" to those he performed at Modern Continental. (*Id.* at 116)

In support of his claim of disability, the plaintiff asserts that in his ameliorated condition [9] he has been advised to "avoid strenuous physical exertions, sudden acute emotional upsets ..., operating heavy machinery or automatic power tools ..., ... walking on scaffolding, roofs, ascending ladders, or working in other situations where .. [he might] fall from a height." (# 196, Exh. 37) Further, Hurley has been told to "avoid environments where high electrical, magnetic or other forms of radiant energy exist." (# 196, Exh. 38) Consequent to these restrictions, the plaintiff claims

> there are many classes of jobs in the economy at which I am unable to work, including welder, electrician, electrical engineer, forklift operator, mason, steel erector, construction site excavator, plumber, teamster, warehouseman, ironworker, machinist, machine operator, stock clerk, delivery person, HVAC technician, maintenance engineer, laborer, ditch digger, firefighter, law enforcement officer, telephone or utility lineman, carpenter, roofer, and painter.

Exhibits To Plaintiff's Statement Of Material Facts # 196, Exh. 27.

However, nothing has been proffered that would allow the litany of jobs that the plaintiff purportedly cannot perform to be placed in any context, i.e., whether or not they represent "a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities." The record is silent with respect to "the number and types of jobs utilizing similar training, knowledge, skills or abilities, within the geographical area." Moreover, it seems somewhat implausible that the jobs of ditch digger or stock clerk or delivery person would represent the types of jobs that would utilize the education and

---

9. The *Sutton* decision teaches that "the determination of whether an individual is disabled should be made with reference to measures that mitigate the individual's impairment." *Sutton,* —— U.S. ——, 119 S.Ct. 2139, 2142, —— L.Ed.2d ——.

experience of an average person with Hurley's background.

Further, the plaintiff's position that he is "substantially limited" is undercut by the fact that he has been employed as a project manager by at least two construction companies since his dismissal from Modern Continental.[10] (# 176, Exh. A at 7, 10–11; Exh. M) While these jobs seem to involve smaller private construction projects, such as renovating office space (# 176, Exh. A at 7–8) rather than large public projects which the defendant corporation undertakes, they do seem to involve the same skills, i.e., "contract negotiations, purchase order awards, supervision of the project[s]" (*Id.* at 8, 42), "estimating" (*Id.* at 9, 12), supervision of laborers (*Id.* at 12), and "contract scheduling" (*Id.* at 42).

Lastly, Hurley claims he can do other work for Modern Continental and faults the company for failing to accommodate him by placing him in another job within the company for which he was qualified and which were available. But as the Supreme Court said in *Sutton*, "[i]f jobs utilizing an individual's skills (but perhaps not his or her unique talents) are available, one is not precluded from a substantial class of jobs." *Sutton*, —— U.S. ——, 119 S.Ct. 2139, 2150, —— L.Ed.2d ——.

In sum, Hurley has failed to adduce sufficient evidence to raise a genuine issue of material fact as to whether he was substantially limited in the major life activity of working. Since this a prerequisite to establishing liability under the ADA, the defendants are entitled to the entry of judgment in their favor on the plaintiff's federal claim.

### B. Hurley's Theory That He was "Regarded As" Having A Disablility

■ On June 24, 1999, a Procedural Order (# 228) was issued directing the parties to address "the question of what effect, if any, the Supreme Court's decisions of June 22, 1999 have on the pending motion for summary judgment." In his responsive submission (# 230), the plaintiff contends for the first time that he is disabled not only because he purportedly has "a physical or mental impairment that substantially limits one or more of [his] major life activities" as he has asserted throughout this litigation, but also as a consequence to his "being regarded as having such an impairment." *See* 42 U.S.C. § 12102(2). This sudden argument premised upon the third prong of the definition of disability under the ADA quite simply comes too late.

A review of the complaint reveals that this "being regarded" theory of liability was not pled. Even more significant at this juncture is the fact that this potential alternative ground for liability was never advanced by the plaintiff in any of his papers filed to counter the defendants' motion for summary judgment. Indeed, Hurley specifically delineates his claims in his memorandum in opposition to the defendants' dispositive motion as follows:

> In this case, plaintiff asserts two independent forms of "failure to accommodate" liability. First, he asserts that defendants acted illegally by failing to discuss, consider, or engage in an "interactive" process with him as to whether he could be accommodated in his former job. Second, defendants failed to provide him with the reasonable accommodation of a transfer to a suitable position.

Plaintiff's Opposition To Defendants' Motion For Summary Judgment (# 191) at 3 (citations and footnote omitted).

---

10. The defendants also note that after recovering from his surgery, the plaintiff has resumed pursuing many of his athletic interests. For instance, Hurley began running again around March or April of 1993 and, although he does not undertake as strenuous a training regime as he did prior to his heart operation, he has run about seven or eight miles consecutively and has competed in competitive road races. (# 176, Exh. A at 273) Since his operation he has also played hockey, gone skiing and bike riding. (# 176, Exh. A at 274)

The plaintiff could have alleged "regarded as" liability since the nascence of this suit. Hurley's suggestion that this basis for liability need not or perhaps could not have been raised earlier [11] is not sound and, indeed, is belied by the fact that the cases he now cites in support of his position predate *Sutton*. *See* # 230 at 3–4. In short, the plaintiff's belated attempt to assert a novel ground for liability in order to avoid the entry of judgment in favor of the defendants on his ADA claim cannot be countenanced.

### C. The State Claim of "Handicap" Discrimination

■ Finally, with judgment to enter for the defendants on the single federal claim advanced by the plaintiff, "the Court should decline to exercise pendent jurisdiction over the state law claims and they too, therefore, should be dismissed." *Mc-Donald v. Commonwealth of Massachusetts*, 901 F.Supp. 471, 479 (D.Mass., 1995) citing *United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966); *Rodriguez v. Doral Mortgage Corporation*, 57 F.3d 1168, 1177 (1 Cir., 1995) ("As a general principle, the unfavorable disposition of a plaintiff's federal claims at the early stages of a suit, before the commencement of trial, will trigger the dismissal without prejudice of any supplemental state-law claims.") After weighing all the attendant circumstances in this case, most particularly the uncertainty as to whether the Massachusetts Supreme Court will follow the lead of the United States Supreme Court in circumscribing the contours of the applicable disability discrimination law,[12] in my discretion I shall dismiss the plaintiff's state law claim without prejudice. *See Rodriguez*, 57 F.3d at 1177 ("Another factor to be weighed is the clarity of the law that governs a pendent claim, for a federal court may be wise to forego the exercise of supplemental jurisdiction when the state law that undergirds the nonfederal claim is of dubious scope and application.").

### V. Conclusion and Order

Accordingly, it is ORDERED that the Defendants' Motion For Summary Judgment (# 173) be, and the same hereby is, ALLOWED to the extent that judgment shall in favor of the defendants on Count I of the complaint. It is further ORDERED that Count II of the complaint be, and the same hereby is, DISMISSED without prejudice to bringing the claim in state court.

---

11. In a footnote Hurley writes:

    Plaintiff appreciates that the court's June 24, 1999, Order did not expressly ask the parties to discuss the "regarded as" issue, which was not analyzed in any depth in plaintiff's summary judgment Opposition. However, the effect of the *Sutton* decision requires that the "regarded as" issue be addressed now. Under the state of the law in this Circuit prior to June 22, 1999, (*Arnold v. UPS*, 136 F.3d 854 (1st Cir.1998)), a plaintiff's disability for ADA purposes was to be considered without reference to ameliorative measures, under which standard plainly qualified as disabled. Thus, the *Arnold* holding obviated the necessity of reaching the issue of the third prong of the ADA definition of disability. Because *Sut-ton* has effectively overruled *Arnold*, the proper presentation of plaintiff's case now requires him to examine the "regarded as" issue as part of his summary judgment analysis.

    Plaintiff's Memorandum # 230 at 2 n. 3.

    The *Arnold* decision neither foreclosed the plaintiff's ability to allege disability under different prongs of the ADA definition nor did it somehow "obviate" the plaintiffs obligation to raise and argue any and all alternate theories of liability at least in opposition to the defendants' summary judgment motion.

12. A question which plaintiff has asked me to certify to the Supreme Judicial Court. *See* Plaintiff's Motion for Certification, Etc., filed July 12, 1999.