### Michael HURLEY, Plaintiff,

v.

### MODERN CONTINENTAL CONSTRUCTION COMPANY, INC., Charles Madden, Individually and as Senior Vice President of Modern Continental Construction Company, Inc., Defendants.

### Civil Action No. 94–11373–RBC.[1]

United States District Court, D. Massachusetts.

Nov. 23, 1999.

Ilyse Levine Kanji, Angoff, Goldman, Manning, Pyle, Wanger & Hiatt, P.C., Ellen J. Messing, Messing & Rudavsky, PC, Boston, MA, for plaintiff.

Richard D. Wayne, Hinckley, Allen & Snyder, Boston, MA, for defendants.

### *MEMORANDUM AND ORDER ON PLAINTIFF'S MOTION TO ALTER OR AMEND JUDGMENT (# 236)*

COLLINGS, Chief United States Magistrate Judge.

## *I. INTRODUCTION*

On July 19, 1999, judgment entered in favor of the defendants, Modern Continen-

---

1. With the parties' consent, this case has been referred and reassigned to the undersigned for all purposes, including trial and the entry of judgment, pursuant to 28 U.S.C. § 636(c).

tal Construction Company, Inc. ("Modern Continental") and Charles Madden ("Madden") on plaintiff Michael Hurley's ("Hurley") claim under the American With Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 et seq. (# 235) In addition, the state law disability claim alleged in the complaint was dismissed without prejudice. (# 235)[2]

Pursuant to Fed.R.Civ.P. 59(e), Hurley has now filed a Motion To Alter Or Amend Judgment (# 236). The plaintiff claims that the Court erred in declining to consider his argument that in addition to being disabled within the meaning of 42 U.S.C. § 12102(2)(A), i.e., he had "a physical or mental impairment that substantially limits one or more of the major life activities", he was also "regarded as disabled" within the meaning of 42 U.S.C. § 12102(2)(C). Indeed, viewing this latter contention as being raised for the first time in response to a procedural order,[3] I wrote "[t]his sudden argument premised upon the third prong of the definition of disability under the ADA quite simply comes too late." Hurley v. Modern Continental Const. Co. Inc., 54 F.Supp.2d 85, 95 (D.Mass., 1999). In view of all the circumstances in this case, the plaintiff asserts that the Court was incorrect in refusing to afford his "regarded as disabled" argument full and fair consideration on the merits.

Resolution of the procedural point is unnecessary to the resolution of the plaintiff's motion. Even assuming arguendo that Hurley is correct in his assertion of "manifest error of law",[4] a ruling on the merits of the plaintiff's "regarded as disabled" claim does not alter the original outcome that the defendants are entitled to the entry of judgment as a matter of law.

The June 1999 Supreme Court ADA decisions are both instructive and controlling. In one of these cases, the Court explained at some length that:

Under subsection (C), individuals who are "regarded as" having a disability are disabled within the meaning of the ADA. See § 12102(2)(C). Subsection (C) provides that having a disability includes "being regarded as having," § 12102(2)(C), "a physical or mental impairment that substantially limits one or more of the major life activities of such individual," § 12102(2)(A). There are two apparent ways in which individuals may fall within this statutory definition: (1) a covered entity mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities, or (2) a covered entity mistakenly believes that an actual, non-limiting impairment substantially limits one or more major life activities. In both cases, it is necessary that a covered entity entertain misperceptions about the individual—it must believe either that one has a substantially limiting impairment that one does not have or that one has a substantially limiting impairment when, in fact, the impairment is not so limiting. These misperceptions often "resul[t] from stereotypic assumptions not truly indicative of . . . individual ability." See 42 U.S.C. § 12101(7). See also School Bd. of Nassau Cty. v. Arline, 480 U.S. 273, 284, 107 S.Ct. 1123, 94 L.Ed.2d 307 (1987) ("By amending the definition of 'handicapped individual' to include not only those who are actually physically impaired, but also those who are regarded as impaired and who, as a result, are substantially limited in a major life · activity, Congress acknowl-

---

**2.** The judgment reflects the rulings made in a Memorandum And Order On Defendants' Motion For Summary Judgment (# 234) issued on even date and which is incorporated herein by reference. Hurley v. Modern Continental Const. Co. Inc., 54 F.Supp.2d 85 (D.Mass. 1999).

**3.** The Procedural Order (# 227) issued after the defendants' summary judgment motion had been fully briefed in order to elicit the parties' positions regarding the impact of certain recent Supreme Court decisions.

**4.** The defendants do not agree with the plaintiff's position that a manifest error of law was committed.

edged that society's accumulated myths and fears about disability and disease are as handicapping as are the physical limitations that flow from actual impairment"); 29 CFR pt. 1630, App. § 1630.2(*l*) (explaining that the purpose of the regarded as prong is to cover individuals "rejected from a job because of the 'myths, fears and stereotypes' associated with disabilities").

*Sutton v. United Air Lines, Inc.,* 527 U.S. 471, 119 S.Ct. 2139, 2149–50, 144 L.Ed.2d 450 (1999).

■ In this case Hurley is proceeding under the second scenario, alleging that Madden and thus Modern Continental inaccurately perceived his cardiac impairment as disabling him in the major life activity of working, when in fact, he was not so limited. (Plaintiff's Memorandum # 230 at 2–3) "[T]he test [for perceived disability] is whether the defendant treated the plaintiff adversely because it regarded him as having an impairment that substantially limits one or more major life activities." *Weber v. Strippit, Inc.,* 186 F.3d 907, 915 (8 Cir.1999) (citations omitted). The Supreme Court has written that:

> When referring to the major life activity of working, the Equal Employment Opportunity Commission (EEOC) defines "substantially limits" as: "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities." 29 CFR § 1630.2(j)(3)(i) (1998). The EEOC further identifies several factors that courts should consider when determining whether an individual is substantially limited in the major life activity of working, including "the number and types of jobs utilizing similar training, knowledge, skills or abilities, within [the] geo-

graphical area [reasonably accessible to the individual], from which the individual is also disqualified." § 1630.2(j)(3)(ii)(B). Thus, to be regarded as substantially limited in the major life activity of working, one must be regarded as precluded from more than a particular job. *See* § 1630.2(j)(3)(i) ("The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working.") [5].

*Murphy v. United Parcel Service, Inc.,* 527 U.S. 516, 119 S.Ct. 2133, 2138, 144 L.Ed.2d 484 (1999); *see also Sutton,* 119 S.Ct. at 2151 ("When the major life activity under consideration is that of working, the statutory phrase 'substantially limits' requires, at a minimum, that plaintiffs allege they are unable to work in a broad class of jobs. Reflecting this requirement, the EEOC uses a specialized definition of the term 'substantially limits' when referring to the major life activity of working: 'significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities. The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working.' § 1630.2(j)(3)(i) ... To be substantially limited in the major life activity of working, then, one must be precluded from more than one type of job, a specialized job, or a particular job of choice. If jobs utilizing an individual's skills (but perhaps not his or her unique talents) are available, one is not precluded from a substantial class of jobs. Similarly, if a host of different types of jobs are available, one is not precluded from a broad range of jobs.")

[2] The plaintiff's claim under § 12102(2)(C) falters on the same step as did his claim under § 12102(2)(A). There has been insufficient evidence proffered from which a jury could find that Madden [6]

---

**5.** The Court assumed, without deciding, that the EEOC regulations were valid. *Murphy v. United Parcel Service, Inc.,* 527 U.S. 516, 119 S.Ct. 2133, 2138, 144 L.Ed.2d 484 (1999).

**6.** There is no dispute that Madden is the person who decided that Hurley was to be terminated.

perceived Hurley as having a condition which significantly restricted Hurley from working in a broad range of jobs. As noted in the prior Memorandum, Hurley testified that he disqualified himself from his then-current position as a project engineer on Deer Island due to the level of stress. *Hurley,* 54 F.Supp.2d at 90–1. At most the undisputed record reflects that Madden believed that the plaintiff was unsuited for jobs as an estimator or safety officer[7] because those positions were even more stressful than that of a project engineer.[8] *Hurley,* 54 F.Supp.2d at 90–1. Disqualification from a single job or a narrow range of jobs is not enough to establish a significant restriction from a major life activity. *Lessard v. Osram Sylvania,* 175 F.3d 193, 198 (1st Cir.1999); *Sorensen v. University of Utah Hospital,* 194 F.3d 1084, 1087–88 (10 Cir. Utah); *Piascyk v. City of New Haven,* 64 F.Supp.2d 19, 32–34 (D.Conn.).

Of course, in making a determination of this issue on defendants' motion for summary judgment, I must take the evidence in the light most favorable to the plaintiff. Ironically, the evidence to which the plaintiff points is evidence from the *defendants'* witnesses as to what occurred at two meetings on January 28 and February 10, 1993. It is this evidence which plaintiff asserts is the basis of a claim that the defendants regarded him as more limited than he actually was.

At his deposition, Madden testified about the first meeting with Harrington and Hurley:

> Q. Did he say anything at the meeting with reference to his job on Deer Island?

> A. My recollection was that he couldn't go back to Deer Island because he could not have any stress.

> Q. He said he couldn't have any stress at all?

> A. That's my recollection.

> Q. Was there any discussion of whether the position at Deer Island could be modified to accommodate him?

> A. There was no discussion relative to modification because he told me he could not go back to Deer Island.

> Q. Was there any discussion about any other jobs within the company that—

> A. That particular day, none, because he didn't know what he wanted to do and he was going on vacation to sort things out.

Exhibits To Plaintiff's Statement # 196 at 162.

Madden, reciting his version of what happened at their second meeting in a memo to the file, "asked [Hurley] if he came up with a position within the Construction Company that he could fill given his restrictions" ... and he [Madden] "asked about the other positions of employment within other areas of the Company's (sic) specifically mentioned was Marino's Restaurant and Lookout Farm." (# 230, Attachment A; *see also* # 230 at Attachment C, D[9]) According to Madden, it was Hurley who indicated that such positions would be too stressful. (# 230, Attachment A.)

Madden's exact testimony was as follows:

> Q. ... can you tell me what happened at the second meeting.

---

7. No openings were available for these jobs at the time in any event. *Hurley,* 54 F.Supp.2d at 91.

8. The Supreme Court recognized in *Sutton* that "an employer is free to decide that physical characteristics or medical conditions that ... are limiting, but not substantially limiting, impairments make individuals less than ideally suited for a job." *Sutton,* 527 U.S. at ——, 119 S.Ct. at 2150; *Dickerson v. United Parcel Service, Inc.,* 1999 WL 966430*6–7 (N.D.Tex.).

9. Two other attendees at the meeting recorded their versions of what transpired, both of which are comparable to Madden's recollection.

A. To the best of my recollection the meeting began—I asked him how his vacation was.

Q. I'm sorry. "Him" being Mr. Hurley?

A. "Him" being Mr. Hurley. He said he had a good time, if I recall. I asked him what he wanted to do, what he intended to do. And he reiterated—What I think he said was he couldn't go back to Deer Island because of the stress. I said, "Well, you know, what do you think we should do? How do I handle that, going back to Deer Island?"

And he asked me about a job in Ent—not in Enterprises—in estimating. And I asked him if he had ever seen a day when we're bidding a public job, a public works job. And stress there in my opinion was ten times greater than any stress you'll experience on a construction site. And I didn't think that was a good option for him. He asked me—he indicated because of the stress he couldn't do that.

Q. Did he say anything in response to that?

A. Not to my recollection.

Q. I'm sorry. Please continue.

A. He asked me about safety, and I said safety would require climbing ladders, going into confined spaces, things that may have other problems with what he outlined to me. There was no response to that either.

I said to him we had a restaurant and we could look into getting—exploring jobs in the restaurant but any job he took in the restaurant the pay would be commensurate with the position that he took.

I indicated that we had a farm and the same thing would hold true at the farm. Michael indicated that he couldn't take a cut in pay because he was a sole—you know, a single person, sole provider.

I think at that point or—I think at that point I indicated that the pay that he's received to date was all coming from Modern Continental and that had to stop; that couldn't continue unless he could come back to work. And he indicated because of the stress he couldn't do that.

List of Exhibits # 176, Exh. C at 176–78.

This evidence reflects that Madden offered the plaintiff options, undercutting any inference that he perceived Hurley to be significantly restricted from a broad range of jobs. Rather, the evidence suggests that it was the plaintiff who limited himself.

What is ironic is that plaintiff, in his depositions, denied that what Madden and the others said happened at the meeting was correct. Plaintiff's testimony respecting the meetings is as follows:

Q. At any time prior to the meeting with Mr. Madden [on January 28th] did you express to Mr. Harrington [Hurley's immediate supervisor] that you did not believe that you could return to your former job duties on Deer Island?

A. Well, I had discussed that with Steve Harrington, and that was part of my concern. I told him that I couldn't return to the project due to the extreme level of stress that we were dealing with and working under on the island.

\* \* \* \* \* \*

Q. And do you recall what you said during that [the January 28th] meeting?

A. Well, I updated Mr. Madden as to the medical condition because I don't believe he had any information regarding what I had experienced and the surgery that I had gone through and what changes I was going to have to make in my life.

During that time, I discussed what options I thought might be available for working in the other areas of the

company. I informed him that I didn't feel that I could return to Deer Island at that time due to the level of stress, primarily.

List of Exhibits # 176, Exh. A at 179, 181.

Hurley's recollection of the second meeting on February 10th was similar to his recollection of the first:

Q. And at any time during this meeting did you state that you wanted to return to Deer Island, resume your former job duties?

A. The same subjects discussed during the first were reviewed, and again I mentioned the options of working within another area of the company; such as, estimating or safety or whatever might be available, and I probably stated again that I didn't feel I could return to Deer Island due to the level of stress that we all were dealing with at that project.

List of Exhibits # 176, Exh. A at 185; *see also* Exhibits To Plaintiff's Statement # 196, Exh. 5 at 337 ("I outlined the fact that I could not return to Deer Island under the extreme level of stress that I had been previously experiencing out at Deer Island.")

Hurley further stated:

Q. Your desire to remain working, did that include your desire to remain in your former position?

A. If we could minimize stress.

Q. Did you ever state to Mr. Madden or anyone else that you would stay in your former position if you could minimize stress in your former position?

A. I don't recall that I did.

List of Exhibits # 176, Exh. A at 354.

As to other job prospects within the company, the plaintiff's testimony is that:

Q. Do you recall, though, Mr. Madden asking you to identify jobs that you may have known within the company that could accommodate your low stress requirement?

A. I had mentioned to Mr. Madden two areas that I thought may be different areas that I could work within the company if I was not to be working at Deer Island, and I suggested to Mr. Madden the options of estimating and the safety area.

Exhibits To Plaintiff's Statement # 196, Exh. 5 at 284.

With respect to the estimating or safety positions, Hurley testified that:

Q. Was there any discussion about the stress as it relates to estimating?

A. I don't recall if there was. I recall the question that he [Madden] asked of me was simply that did I feel that estimating or working in the safety area or any other area of construction in the business, in general, could be stressful, to which I responded, yes, they could be.

Exhibits To Plaintiff's Statement # 196, Exh. 5 at 285–85.

Along the same lines was this colloquy:

Q. Aside from estimating, were there any other job duties and responsibilities that were discussed?

A. I had asked about the possibilities of working within the area of safety within the company.

Q. What was said in regard to that?

A. Mr. Madden asked me if I thought that that might be a stressful position, as well.

Q. And what did you say in regard to that?

A. Again, I responded that it could be a stressful area.

Q. Was there any discussion about your physical limitations in regard to performing safety functions?

A. No, there was not.

Exhibits To Plaintiff's Statement # 196, Exh. 5 at 188.

It is apparent that Hurley disagrees with Madden's recollection of the discussion at the February 10th meeting:

Q. Do you recall at any time during this meeting a discussion with Mr. Madden concerning areas of employment within the affiliated businesses of the company?

A. We didn't discuss anything further than what I had suggested as far as working at estimating or safety. There were no other options discussed or presented during our first meeting or this meeting with Mr. Madden.

\* \* \* \* \* \*

Q. I am just asking to be clear whether you agree or disagree that that matter was discussed at the meeting; that matter being Charles Madden inquired into other areas within other affiliated businesses of the company, and I'm asking are you disagreeing that that was discussed during the meeting.

A. I recall that Mr. Madden had said that he had contacted other individuals within the company and that no other positions were available at or within the company of Modern Continental.

Exhibits To Plaintiff's Statement # 196, Exh. 5 at 289.

To the same effect is the plaintiff's further testimony:

Q. Now, aside from estimating and safety, do you recall any other job possibilities that may have been discussed?

A. There were no other job possibilities discussed aside from the discussions that I have made.

Exhibits To Plaintiff's Statement # 196, Exh. 5 at 190.

In deciding the motion for summary judgment, to which version do I give weight? If I credit Hurley's version, the

evidence to which plaintiff's counsel points in support of the contention that the defendants regarded Hurley as more limited than he was is lacking. If I credit the defendants' version, upon which plaintiff relies, any suggestion of other jobs which Madden made to Hurley were rejected by Hurley as being too stressful. It can hardly be said that the defendants regarded Hurley as being more limited than he was when all they were doing was crediting what Hurley told them. This is plainly insufficient to make out a triable case.[10]

However, as I said earlier, whatever version is credited, and taking the evidence is the light most favorable to the plaintiff as to what jobs Madden and the others believed Hurley could not do, I rule that the evidence is insufficient to raise a triable issue as to whether, either in actuality or as regarded by the defendants, Hurley was substantially limited from a broad range of jobs.

For the reasons stated, the judgment shall stand. It is ORDERED that Plaintiff's Motion To Alter Or Amend Judgment (# 236) be, and hereby is, DENIED.

---

**10.** I might add that a person is not disqualified from a class of jobs because they would pay less than what he had previously been earning. According to Madden's deposition testimony, reproduced *supra* at p. 10, Hurley rejected the suggestion of jobs at the restaurant and farm because Hurley said he could not take a cut in pay.